UNITED STATES TRUST COMPANY OF NEW YORK, as Trustee under the Will of CHARLES F. G. HEYE, Deceased, Respondent, Appellant, *v.* GEORGE G. HEYE and Others, Appellants, Respondents.

First Department, February 1, 1918.

Decedent's estate — testamentary trust — apportionment of stocks of corporations subsidiary to Standard Oil Company between capital and income — apportionment of dividends between capital and income — apportionment of rights to subscribe for stock — properties purchased by accumulated profits before and after creation of trust — increase in value of stock not income — test by which to determine whether allotment of profits to income will impair capital — time when trust was created — time of declaration of dividends controls allotment thereof.

Where a trustee under a will giving the income of the trust estate to life beneficiaries with remainders over at the expiration of the trust held stock of the Standard Oil Company of New Jersey and, when said company was judicially declared to be an illegal combination in restraint of trade, received from said combination on its dissolution the stocks of its constituent corporations, said stocks should be held as part of the *corpus* of the trust estate and should not be distributed to the life beneficiaries as income.

The above rule holds although the present value of the Standard Oil stock of New Jersey remaining in the trust estate after said distribution exceeds the value of all the stocks when the trust was created, for that fact affords no justification for disrupting the *corpus* of the trust.

In the apportionment of the stocks of the subsidiary companies between the *corpus* and income the *corpus* of the trust must be preserved for the benefit of the remaindermen.

In the case of an extraordinary dividend declared on stocks held as part of a trust estate it is the duty of the court to inquire what the sources are and to credit to capital account so much of the dividend as is derived from or constitutes a distribution of capital (including profits accrued before the creation of the trust) and to credit to the income account so much thereof as is derived from or constitutes a distribution of profits accruing during the lifetime of the trust.

Although the books of the corporation distributing the stocks of the constituent companies treat the distribution as one of reserved or accumulated profits, such statements are mere bookkeeping entries and do not affect the fact that the transaction was a redistribution of capital assets.

The capital of the Standard Oil Company of New Jersey was depleted by taking therefrom the assets of its subsidiary companies although after such deduction the book value of the oil company's shares was larger than when the testamentary trust was created.

Stocks of the subsidiary companies which at the time of the creation of the trust and prior to the testator's death were owned by the Standard Oil Company of New Jersey were properly apportioned to the capital of the trust estate, for the testator's ownership of a share of all of the assets of the Standard Oil Company of New Jersey carried with it a similar interest in the stock of the subsidiary companies and such interest cannot be severed and allotted to income without impairing the integrity of the *corpus* of the trust.

Where a subsidiary oil company whose stock was held by the Standard Oil Company of New Jersey prior to the creation of the trust, owned the stock of other subsidiary companies which it had purchased out of surplus earnings after the formation of the trust, the stock of said subsidiary companies which were distributed on the disintegration of the Standard Oil Company of New Jersey should be allotted to the capital of the trust.

But stock of subsidiary companies purchased by the Standard Oil Company of New Jersey with earnings accumulated after the formation of the trust should be allotted to the life beneficiaries, as it involves no impairment of the original *corpus* of the trust.

In determining whether a distribution of stocks acquired out of and representing surplus earnings after the formation of the trust, the basic inquiry is whether a distribution thereof to the life tenants would intrench upon the *corpus* of the original trust.

Distribution of extraordinary dividends made by subsidiary companies and by the Standard Oil Company of New Jersey after the disintegration of said company should be allotted to the life beneficiaries as well as dividends declared but not yet paid.

But the right of the trustee to subscribe for additional stock of the subsidiary companies at par should be allotted to the principal of the trust for the life tenants are not entitled to said subscription rights.

So, too, similar subscription rights should be allotted to the capital of the trust although the corporations offering said rights declared at the same

time a cash dividend and authorized subscribers to apply the same in payment for additional stock.

Rights to subscribe for stock at par offered to stockholders by constituent companies should not be treated as an extraordinary dividend and allotted to the income of the trust estate, for such subscription rights belong to the capital, otherwise the trustee's proportion of interest in the assets of the companies would be materially altered for the worse.

Where subsidiary oil companies whose stock was part of the trust estate formerly owned pipe lines and, in order to escape regulation by the Interstate Commerce Commission, had the pipe lines separately incorporated and took back the stock of said companies in return for the pipe line properties, and the stocks were then distributed among stockholders *pro rata*, said distribution was not a dividend to be allotted to life beneficiaries, but on the contrary was part of the original *corpus* of the trust.

In making calculations necessary for the apportionment of the dividends declared by the former subsidiary companies of the Standard Oil Company of New Jersey there are two dates to be determined: *First*, the date of the creation or establishment of the trust, and *second*, the date to be taken for the purpose of ascertaining whether the capital of the trust will be impaired by extraordinary dividends declared. The former date is not the date of the testator's death but the date when the trustee received the securities from the executrix. The second date is not that of the time of the distribution of the dividend but, on the contrary, is the date when the dividend was declared.

PAGE, J., dissented in part, with opinion; DOWLING, J., dissented, with opinion.

CROSS-APPEALS from a judgment of the Supreme Court, entered in the office of the clerk of the county of New York upon the report of a referee, judicially settling the accounts of the plaintiff trustee and instructing it as to the disposition to be made of certain securities, extraordinary dividends and stock subscription rights.

*George L. Shearer* of counsel [*Stewart & Shearer,* attorneys], for the plaintiff, respondent, appellant.

*F. Kingsbury Curtis* of counsel [*Hugo Kohlmann* with him on the brief], for the defendants George G. Heye and Marie Heye Clemens, individually and as executors, etc., of Marie Antoinette Heye, deceased, appellants, respondents.

*Eugene D. Alexander,* guardian *ad litem* of infant defendants Dorothy Heye Clemens and Antoinette Wagener Clemens, respondents, appellants.

SHEARN, J.:

This case involves the application of the rules of apportionment of trust property between life beneficiaries and remaindermen, growing out of a distribution of the bulk of the assets of the Standard Oil Company of New Jersey on December 1, 1911, in pursuance of a decree of the United States Circuit Court, adjudging that company and its constituent companies to be an unlawful combination or conspiracy in restraint of trade and enjoining the continuance of the combination. Numerous questions have arisen out of the complexity of the corporate transactions, but one basic principle applies to all. The main question deals with the correct apportionment of the distributed shares of capital stock of the subsidiary companies that substantially constituted the Standard Oil Trust and supplied five-sixths of its earning capacity.

Briefly stated, the essential facts underlying the main question are these: Charles F. G. Heye died on February 8, 1899, leaving a will executed March 23, 1898, which was admitted to probate on February 17, 1899. He left surviving him his wife, a son and a daughter. By his will he gave his residuary estate to the United States Trust Company of New York, as trustee, and directed that it be divided into three equal parts. The trustee was directed to pay and apply " the net income, rents, issues and profits " of one part to the use of the wife for life, the principal to go to such persons as she might appoint by will, and, in default of appointment, to his children. The net income of one part was to be applied to the use of his daughter during her life and upon her death leaving issue the principal was to go to such issue. The net income of the third part was to be applied to the use of the son until he arrived at a certain age, when the principal share was, with the exception of $100,000 reserved in trust, to be paid over to him.

Among the assets of which the testator died possessed and which the trustee received from the executrix of the will on May 10, 1899, were certificates for certain shares and fractional shares of the capital stock of twenty corporations which had, prior to the ouster judgment of the Supreme Court of Ohio in 1892, constituted the so-called Standard Oil

Trust, created by agreements dated January 2 and 4, 1882, by which the shares of stock of certain companies theretofore held by certain individuals and corporations for common account were transferred to trustees, who issued certificates of beneficial interest therein to the beneficial owners of the stocks. These certificates for shares and fractional shares of the capital stock of the twenty corporations represented the equivalent of $370,000 par value of the aforesaid Standard Oil Trust certificates which had been owned by the testator and surrendered by him to the trustees of the Standard Oil Trust pursuant to a plan adopted to provide for its dissolution. Included in these certificates owned by the testator when he died were 380 and certain fractional shares of the Standard Oil Company of New Jersey. In the year 1899 a plan was perfected for bringing these twenty oil companies again under common and unified control and management by constituting the Standard Oil Company of New Jersey the parent or holding company and transferring to it the ownership of the capital stock of the nineteen other companies. With this end in view, in the year 1899 the capital stock of the Standard Oil Company of New Jersey was increased from 100,000 shares of the par value of $10,000,000 to 1,100,000 shares of the par value of $110,000,000, of which 1,000,000 shares were common stock and 100,000 shares were preferred stock, the stock of the Standard Oil Company of New Jersey previously outstanding being converted into preferred stock, and the officers of that corporation were duly authorized to issue said certificates of common stock in purchase of the stock of the remaining nineteen of said corporations and its own preferred stock at the rate of one share of such common stock for shares or various fractional shares of the stock of such other corporations and of its preferred stock. Accordingly, on or about August 11, 1899, the trustee under the will of Charles F. G. Heye surrendered to the Standard Oil Company of New Jersey the said certificates of stock of the said twenty corporations, which certificates were actually in the possession of Mr. Heye at the time of his death, and received in exchange therefor 3,700 shares of the common stock of the Standard Oil Company of New Jersey. Thereupon the trustee in dividing the residuary estate of Mr. Heye

into three equal parts as directed by his will allotted 1,234 shares of the said common stock of the Standard Oil Company of New Jersey to the trust created for the benefit of the testator's wife, 1,233 shares to the trust created for the benefit of the daughter, and 1,233 shares to the trust created for the benefit of the son. As trustee for the wife the trustee has ever since held said shares allotted to the trust created for her benefit; and also has ever since held the shares allotted to the trust created for the benefit of the daughter; but, as trustee for the benefit of the son, the trustee had prior to September 1, 1911, duly disposed of all of the shares of stock allotted to the trust created for his benefit with the exception of 47 shares. At the time the Standard Oil Company of New Jersey acquired the whole of the stocks of the nineteen other companies, it already owned some subsidiary companies and during the life of the trust it acquired the stock of still others, so that by 1911 it held either all or a majority of the stock of thirty-three companies engaged in the business of producing, refining and distributing oil. Between January 1, 1899, and December 1, 1911, the business of these combined companies was phenomenally prosperous and the Standard Oil Company of New Jersey earned net $823,893,961.13. During the same period it distributed to its stockholders in dividends, after reserving as working capital $328,691,788.13, the total sum of $495,202,173, so that the life beneficiaries of this trust received dividends averaging annually forty per cent. While the individuality of each of the affiliated corporations was scrupulously maintained and all business transactions were transactions of the different corporations severally, throughout the period between 1899 and 1911, as in fact had been the case since the Ohio trust agreement of 1882, the business carried on by the Standard Oil Company of New Jersey and its subsidiaries was conducted as a unified or common business, all the funds employed being utilized by the management as a common fund out of which all amounts requisite for construction and development by the several companies were supplied, each organization being debited or credited with the respective amounts advanced or borrowed and interest being duly debited and credited thereon. In the course of its operations the combination again came in con-

flict with the law and in 1911 on the suit of the Federal government a decree was entered in the United States Circuit Court declaring the Standard Oil Company of New Jersey and its thirty-three subsidiary companies to be an unlawful combination or conspiracy in restraint of trade, upon the ground that the New Jersey company had acquired the power to control the original nineteen constituent companies and the other companies named in the decree, and to manage their trade, "without competition among themselves, as the trade and business of a single person," and the decree enjoined the continuance of this unlawful combination, but expressly provided that "the defendants are not prohibited by this decree from distributing ratably to the shareholders of the principal company the shares to which they are equitably entitled in the stocks of the defendant corporations that are parties to the combination." On July 28, 1911, the directors of the Standard Oil Company of New Jersey passed a resolution to carry out this decree and authorized that the shares of stock of each of the corporations owned by the company be distributed ratably to the stockholders, and all of the stocks were so distributed on December 1, 1911, except the stock of the Anglo-American Oil Company which was distributed on January 20, 1912. The plaintiff as trustee of each of the trusts created by the will of Charles F. G. Heye received the *pro rata* share of the distributed stocks pertaining to the Standard Oil stock forming part of the principal of such trust, and included in the stocks so distributed were the stocks of seventeen of the twenty companies, stock in which was owned by the testator at the time of his death, and of several companies whose stock was already held in 1899 by the Standard Oil Company of New Jersey or by some one of the seventeen companies. The only stocks of the original (twenty) companies owned by the testator, and represented by the 2,514 shares of the Standard Oil Company of New Jersey then in the hands of the trustee, which were not redistributed and turned back in kind to the trustee, were the shares of three companies, to wit, Standard Oil Company of New Jersey, Forest Oil Company and North Western Ohio Natural Gas Company. The stock in the last-named company was not ordered to be distributed and continued to be owned by the Standard Oil

Company of New Jersey and was represented by the stock of that company still held by the trustee. The Forest Oil Company had been absorbed by the South Penn Oil Company in 1902, and the testator's interest in that company came back to the trustee in the shares of the South Penn Oil Company. It is upon this state of facts that the life beneficiaries lay claim to all of the stocks distributed to the trustee in pursuance of said decree, upon the ground that the distribution amounts to an extraordinary dividend of profits, payment of which to the life beneficiaries will not, as it is claimed, entrench upon or impair the integrity of the *corpus* of the trust estate. A much more detailed account of these transactions is set forth in the carefully prepared opinion of Mr. Justice DOWLING.

Reduced to its simplest terms, the situation was this: The *corpus* of the trust was originally a proportionate share interest in twenty oil companies represented by capital stock of each; that same interest continued from 1899 to 1911, represented by the shares of one holding company; after the distribution of December 1, 1911, that same proportionate share interest in the original twenty companies was still held by the trustee, represented by capital stock of eighteen of the original companies.

Claiming the redistribution of 1911 to have been in the nature of an extraordinary dividend, the life beneficiaries demand that there be turned over to them the entire share interest of the seventeen* companies transferred back to the trustee, leaving only as constituting the *corpus* of the estate the original interest in two companies, represented by the stock of the Standard Oil Company of New Jersey, which by the distribution had been stripped of properties constituting five sixths of its earning capacity. To justify this extraordinary result reliance is placed upon (1) the definition of the distribution as an extraordinary dividend, and (2) the fact that the book value of the stock of the Standard Oil Company of New Jersey after the distribution of December 1, 1911, which was $281.72 a share, was greater than at the agreed

* Really eighteen, as the Forest Oil Company had been absorbed in the South Penn Company.— [NOTE BY THE COURT.

date of the creation of the trust December 31, 1899, when it was $202.32 a share.   As this figure of $202.32 included the book value of the stocks of all the nineteen subsidiary corporations originally owned by the testator, the value of the Standard Oil Company of New Jersey stock remaining in the trust after the distribution of December 1, 1911, even if all the distributed stocks went to the life beneficiaries, would exceed the value of the entire trust estate at the creation of the trust.   Therefore, the life beneficiaries contend, if all the distributed stocks went to them, that the integrity of the trust fund would still be preserved because its original *value* would not have been impaired.

To call the distribution of 1911 an extraordinary dividend does not determine the question presented.   In spite of the stress laid on a mere matter of definition, the life beneficiaries concede, as they must, that to entitle them to an apportionment of these stocks the result must be achieved without entrenching in any way upon the *corpus* of the original trust.   Whatever development there has been in the law dealing with this subject of apportionment, whether in this State or elsewhere, it has been uniformly recognized that at all times the integrity of the *corpus* of the trust must be preserved.   No change whatever was made in this rule by the much-cited case of *Matter of Osborne* (209 N. Y. 450). Indeed the decision in the *Osborne* case strongly emphasized the necessity of maintaining the *corpus* unimpaired, the Court of Appeals having expressly held that in all cases of extraordinary dividends, either of money or stock, sufficient of the dividend must be retained in the *corpus* of the trust to maintain that *corpus* unimpaired.   The *Osborne* case is carelessly referred to as though it had enlarged the rights of life tenants.   On the contrary, it materially limited and curtailed them.   Prior to the decision of the *Osborne* case, extraordinary dividends declared by a corporation out of accumulated earnings were apportioned to the life tenant, whether earned before or after the creation of the trust estate. (*McLouth* v. *Hunt*, 154 N. Y. 179; *Lowry* v. *Farmers' Loan & Trust Co.*, 172 id. 137.)   The decision in the *Osborne* case changed this rule, curtailed these rights of life tenants by limiting them to apportionment of accumulations made after

the creation of the trust and, as above stated, emphasized the right of the remainderman to have the integrity of the *corpus* of the trust preserved.

The fundamental inquiry, therefore, is whether the apportionment contended for would impair the integrity of the trust fund.

The *corpus* of the trust fund established in 1899 consisted of capital stock in twenty companies. This means that the trustee owned that definite proportion of the capital assets of *each* company which the shares of stock held in the trust bore to the whole capital stock. Whatever doubt may have previously existed about this was definitely set at rest by the unanimous adoption by the Court of Appeals of the prevailing opinion written by Mr. Justice SCOTT in this court in *Matter of Schaefer* (178 App. Div. 117; affd., on opinion of SCOTT, J., 222 N. Y. 533), for in the minority opinion (p. 131) sharp issue was taken with the basic proposition formulated by Mr. Justice SCOTT that the stock owned and sold by the trustees " represented and stood for one-half of the assets of the company, and those assets in part represented accumulated profits." So it may be taken as settled, for a starting point, that the *corpus* of this estate consisted of that proportion of the capital assets of *each* of the twenty companies which the shares of stock held in the trust bore to the whole capital stock.

When the shares of the nineteen subsidiary companies were transferred to the Standard Oil Company of New Jersey the ownership of the capital assets represented by the trust was transferred to the Standard Oil Company, and the stock of the latter company transferred to the trustees in exchange for the stock of the subsidiary companies represented a proportionate part of what had been the capital assets of both the Standard Oil Company and the subsidiary companies.

When effect was given to the decree of the Supreme Court in 1911 the Standard Oil Company retransferred to its stockholders, the original holders of the stock in the subsidiary companies, the stock which these holders had transferred to it in 1899, thus revesting those stockholders with their interests in the capital assets of the subsidiary companies.

The necessary result of this action was to deplete the capital

assets of the Standard Oil Company, because there was sub-tracted from those assets the capital assets of the subsidiary companies, which constituted a part of the trust fund when it was set up.

The same result would have followed if the Standard Oil Company in 1911 had sold all the stock of the subsidiary companies for cash and then had distributed this cash *pro rata* among its stockholders. This would have been a partial liquidation of the trust, for the cash would have been derived from and have represented a part of the capital assets of the trust. (*Matter of Schaefer, supra.*)

It follows obviously, therefore, that if the *corpus* of the trust be stripped of its interest in the assets of seventeen of the original companies composing it, and left only with the stock of the depleted Standard Oil Company of New Jersey, now minus the properties constituting five-sixths of its earning capacity, the integrity of the trust would not only not be preserved but it would be completely disrupted and its major part handed over to the life tenants. Instead of the remaindermen succeeding ultimately to the testator's interest in the assets of twenty companies, they would get only his interest in two, the Standard Oil Company of New Jersey and the North Western Ohio Natural Gas Company (owned by the former), while the life tenants, in addition to having received annual dividends of forty per cent, would now have the testator's interest in the assets of each of the eighteen other companies constituting the original *corpus* of the trust. No such result was intended by the testator and no rule of law leads to a result so manifestly unjust.

Stress is laid upon the fact that the *value* of the stock left in the trust would exceed the value of all the stocks in the trust when it was created. But this affords no justification for disrupting the *corpus* of the trust. If the only stock in the trust originally had been that of the Standard Oil Company of New Jersey its book value would have been a pertinent fact in determining how any extraordinary dividend of that company should be apportioned, under the rule in the *Osborne* case and under the general rule with reference to preserving the integrity of the trust fund. But when the *corpus* of the trust consists of a definite interest in each of

several companies, the book value of *one* has no bearing upon the integrity of the trust as affected by taking away from the *corpus* the testator's interest in *all the other* companies.

The life beneficiaries have built up their case upon the fact that Judge CARDOZO in *Matter of Brann* (219 N. Y. 263) characterized this Standard Oil distribution as an " extraordinary dividend." As already shown, so far as concerns their right to have apportioned to them these stocks in the seventeen original subsidiary companies, nothing is decided by calling the distribution an extraordinary dividend because, even if such be its character, the stocks cannot go to the life beneficiaries for the reason that thereby the *corpus* of the trust would be disrupted. Moreover, it is very unsafe to attempt to arrive at a correct result in such a case as this by applying a rule to a mere definition. But, it should be pointed out, when Judge CARDOZO used the words " extraordinary dividend " in the *Brann* case he was dealing with a very different question from any here presented. What Judge CARDOZO had to determine was what passed under a bequest of shares of Standard Oil stock contained in a will executed before the distribution of 1911 and republished after the distribution of that year. He expressly speaks of the distribution as an extraordinary dividend " declared during the life of the testatrix," and then proceeds to demonstrate from the provisions of the codicil that the testatrix did not intend to give the subsidiary shares with the main bequest. Of course the distribution of 1911 was in a sense an extraordinary dividend, but under the ruling in the *Osborne* case, followed by *Matter of Megrue* (170 App. Div. 653; affd., 217 N. Y. 623), it is the duty of the court to inquire in case of an extraordinary dividend what its sources are and to credit to capital account so much thereof as is derived from or constitutes a distribution of capital (including profits accrued before the creation of the trust), and to credit to income account so much thereof as is derived from or constitutes a distribution of profits accrued during the lifetime of the trust. This rule works justice both to remaindermen and to the life tenant and accords with the rule laid down in the *Osborne* case. When we inquire as to the source of the distribution under consideration, we find that it constituted the major

part of the capital of the original trust. Its allotment to the life beneficiaries would, therefore, impair the integrity of the trust and be illegal, and the situation would not be one which changed by calling the distribution an extraordinary dividend.

There are certain other matters dwelt upon by the life beneficiaries which seem to me to be wholly inconclusive. One is that " the vouchers of the company and its books treat the distribution as one of reserved profits ' or ' accumulated profits." These statements in the books are mere bookkeeping entries and cannot affect the *fact* that the transaction was a redistribution of capital assets.

Again the fact that the undistributed cash earnings in the hands of the Standard Oil Company at the time of the distribution equalled or exceeded the so-called book value of the stocks distributed does not make the distribution a distribution of earnings or profits. It did not pretend to be any such thing but was avowedly a means adopted by the company to meet the requirements of the judgment which called upon it to dispose of, not its accumulated profits, but its holdings in the subsidiary companies.

Finally the fact that the so-called " book value " of the Standard Oil Company's shares was larger after the distribution in 1911 than it had been when the trust was set up in 1899, does not prove that the capital of the trust fund was not depleted by taking away from the capital assets of the parent company the capital assets of the subsidiary companies. Very many things may have operated to increase the value of the capital assets which were of the Standard Oil Company in 1899 when the trust was set up. At all events the life beneficiaries are not entitled to share in the accumulated earnings, however large, so long as the company kept those earnings in its treasury and neither distributed them as cash dividends nor gave stock dividends to represent them. As was distinctly held in the *Osborne* case the only value of the trust assets which is to be considered is the *intrinsic* value; market value, good will and like considerations cannot be considered in apportioning a dividend. (*Matter of Osborne, supra.*) The remaindermen are entitled to the benefit of any accretion in value of the *corpus* of the trust which does not

arise from the application to capital purposes of earnings accruing after the creation of the trust.

*Equitable Life Assurance Society* v. *Union Pacific R. R. Co.,* quoted from at length in the opinion of Mr. Justice DOWLING, did not involve any question of apportionment between remaindermen and life tenants. As Mr. Justice CLARKE said in this court (162 App. Div. 81, 86): " It must be borne in mind at the outset that the matter under discussion is one of corporation law. It arises and must be decided between the corporation and its several classes of stockholders. The law applicable to wills and to trust estates, to life tenants and remaindermen, is beside the mark."

Further, the Baltimore and Ohio stock involved was a mere investment in the stock of an entirely separate railroad which was not operated as a part of the Union Pacific Railroad Company or of its subsidiaries; and the stock was purchased long after the plaintiff in that case became a stockholder in the Union Pacific Railroad Company.

Coming now to the remaining sixteen corporations whose stocks were distributed on December 1, 1911: Eight were companies whose stocks were owned by the Standard Oil Company of New Jersey in 1899 and prior to the testator's death. These stocks were properly apportioned to capital, for the testator's ownership of a share of all of the assets of the Standard Oil Company of New Jersey carried with it a similar interest in the stock of these subsidiary companies. This interest could not be severed and allotted to income without impairing the integrity of the *corpus* of the trust. Three of the companies, Southwest Pennsylvania Pipe Line Company, Washington Oil Company and Crescent Pipe Line Company, were companies whose stocks were acquired by the Standard Oil Company of New Jersey subsequently to December, 1899, from its subsidiary company, the National Transit Company. Shares of the National Transit Company were a part of the *corpus* of the original trust which were transferred to the Standard Oil Company of New Jersey in 1899 and transferred back to the trustee in 1911. The shifting of the ownership of stock in these three subsidiary companies, owned by the National Transit Company, to the Standard Oil Company of New Jersey, which in turn owned

the stock of the National Transit Company, in no manner affected the testator's interest in the assets of those three subsidiary companies, for his proportionate interest was at all times maintained, at one time represented by his shares in the National Transit Company and later by his shares in the Standard Oil Company of New Jersey, issued to him in exchange for his shares in the National Transit Company. This interest in these three subsidiary companies, which constituted a part of the *corpus* of the original trust, could not be severed therefrom and allotted to the life beneficiaries without impairing the integrity of the trust. Two other companies, the Cumberland Pipe Line Company and the Prairie Oil and Gas Company, were companies whose stocks were owned by the National Transit Company and distributed by that company in 1911 pursuant to the decree and the resolution adopted to carry it out. The Cumberland Pipe Line Company was organized in 1901 by the National Transit Company which took all of its stock. Its lines were located in Kentucky and it gathered oil in the field for delivery to the Eureka Pipe Line Company for conveyance across the West Virginia border, where it was delivered to other Standard Oil pipe line companies for transportation to Standard Oil refineries. Its stock was not held as an investment but was taken over obviously for the purpose of adding to the working plant of the National Transit Company and constituted a part of the capital assets of that company. It does not appear that it was in any sense paid for out of surplus earnings of the National Transit Company accumulated after the formation of the trust. The Prairie Oil and Gas Company was incorporated in 1900. All of its stock was taken by the Forest Oil Company, one of the original twenty companies constituting the *corpus* of the trust, and was transferred in 1902 to the National Transit Company, which held it down to the distribution of stocks in 1911. The Forest Oil Company was a producing company operating in Pennsylvania, all of the stock of which had been held by the Standard Oil trustees and had been distributed by them and acquired by the Standard Oil Company of New Jersey by the issue of its own stock in exchange therefor in and after 1899. The Prairie Oil and Gas Company was the Standard Oil producing company in

the mid-continent field. It supplied from that field a very large part of the oil used by the Standard Oil refineries. The stock of the Prairie Oil and Gas Company was not held by the National Transit Company as an investment but represented an important part of its working plant and constituted a part of its capital assets. It does not appear that the stock of the Prairie Oil and Gas Company was acquired by the National Transit Company out of earnings accumulated after the formation of the trust. The shares of the National Transit Company, which constituted one of the twenty original companies in the *corpus* of the trust, stood for and represented ownership of an interest in the shares of the Cumberland Pipe Line Company and the Prairie Oil and Gas Company, which constituted a part of the capital assets of the National Transit Company, and this same interest was represented by the shares of the Standard Oil Company of New Jersey until the shares of the National Transit Company were redistributed to the trustee in 1911. When, therefore, the National Transit Company in pursuance of the policy of disintegration under the decree, divested itself of these properties in 1911, if the shares in these two subsidiary companies had been allotted to the life beneficiaries the integrity of the trust fund would have been impaired. They were, therefore, properly allotted to principal.

The remaining three companies of the sixteen now under consideration present a different situation. These are the Colonial Oil Company, Standard Oil Company (California) and Standard Oil Company (Nebraska). The stocks of all three of these companies were acquired by the Standard Oil Company of New Jersey out of its cash earnings subsequently to 1899. The Colonial Oil Company was organized in March, 1901, all of the $250,000 of stock being taken by the Standard Oil Company of New Jersey for cash at par. The company was organized to do the Standard Oil Company's marketing business in Australia, Portugal and its dependencies. The Standard Oil Company (California) was originally organized under the name Pacific Coast Oil Company. Its capital stock was $1,000,000, all of which was purchased in December, 1900, by the Standard Oil Company of New Jersey for cash. At the time of the purchase the company owned a small

First Department, February, 1918.     [Vol. 181.

refinery near San Francisco and a small amount of producing property. The name of the company was changed to Standard Oil Company (California). On July 1, 1902, its capital was increased to $3,000,000; on May 6, 1903, to $6,000,000; on October 16, 1906, to $17,000,000, and on August 7, 1911, to $25,000,000. All of these increases of stock were issued for cash at par to the Standard Oil Company of New Jersey at or about the time when the increases took place. The California company erected a very large refinery at San Francisco, constructed an extensive system of pipe lines and acquired a large amount of producing property. In 1906 all of the property of the Standard Oil Company of Iowa, which did the marketing business of the Standard Oil companies in the western states, northwest territories, Honolulu and the Hawaiian Islands, was transferred to the California company. The Standard Oil Company (Nebraska) was organized in 1906 with a capital of $600,000, acquired by the Standard Oil Company of New Jersey for cash. It was organized to take over the Standard Oil marketing business of Nebraska theretofore carried on by the Standard Oil Company of Indiana, which latter company in 1906 conveyed to it all of its marketing stations, plants and facilities in Nebraska. While it does not definitely appear that the stocks of these three companies were acquired out of the surplus earnings accumulated after the formation of the trust, that fact may be fairly inferred from the dates of the transactions and their general nature. If there is any dispute about the fact, it will have to be determined on a reference or by stipulation. As all of the other facts have been agreed upon between the parties, this situation should present no practical difficulty. If these stocks were paid for out of earnings accumulated before the creation of the trust, these stocks were properly allotted to capital for the reasons stated with reference to the stock of the Southwest Pennsylvania Oil Company, Washington Oil Company and Crescent Pipe Line Company. Assuming, however, that these stocks were acquired out of earnings accumulated after the formation of the trust, which appears to be the fact, we think that the learned referee erred and that they should have been allotted to the life beneficiaries. It is true that prior to the distribution in 1911 these stocks

constituted a part of the capital assets of the Standard Oil Company of New Jersey and the properties were a part of its working plant in a business which, notwithstanding the preservation of the corporate identity of all these various companies, was conducted as a unified business under a common control and for the benefit of the Standard Oil Company of New Jersey. But the money withdrawn from earnings and used to purchase these stocks was not permanently capitalized. As was said in *Williams* v. *Western Union Telegraph Co.* (93 N. Y. 162, 191), quoted with approval by Judge HISCOCK in *Equitable Life Assurance Society* v. *Union Pacific R. R. Co.* (212 id. 360, 372): " The company had made surplus earnings which it could have divided, but instead of dividing them it had invested them in property to facilitate and enlarge its business; and such property was found to be worth $15,526,590. That sum constituted its surplus. It was commingled with the other property of the company and used for corporate purposes. But it was not beyond the reach of the dividend-making power of the directors. They could reclaim it for division among the stockholders, and, if practicable, convert it into cash for that purpose." Again, as was said in *Smith* v. *Dana* (77 Conn. 543): " Investment in permanent works does not and ought not to capitalize. Directors can in their discretion, fairly exercised, withhold profits and employ them in the conduct or enlargement of the business. By the same right they ought to be able to, and can, withdraw from any action which will enable the assets thus employed to be returned to their original condition as funds available for distribution to those to whom they might have been originally divided as dividends. Capital of this kind does not bear the perpetual stamp of capital. It simply constitutes a portion of the corporate assets which are within the discretionary control of the directors, which they may use for the corporate advantage in such ways as have the approval of their judgment, or, if that course seems wiser, cease using and by proper action withdraw from the corporate resources."

In the development of the law on this subject the inquiry in these apportionment cases is no longer confined to determining whether the distribution was capital or profits as such.

On this head Judge HISCOCK said in the *Equitable Life Case* (*supra*, p. 371): " As was made clear by Judge CHASE in his thorough consideration of this subject in *Matter of Osborne* (209 N. Y. 450), more frequently the much considered question in this class of cases has been whether the distribution impaired what was the *corpus* or capital of the trust fund when it became effective rather than whether it involved a division of the capital of the corporation." It is clear that the allotment of these stocks to income, acquired as they were after the creation of the trust and with surplus earnings accumulated after the formation of the trust, worked no impairment of the original *corpus* of the trust. So long as the Standard Oil Company of New Jersey retained and used these properties in its business, the life tenants had no ground of complaint. Neither would it have been any concern of theirs if the company had chosen to sell these properties and retain the proceeds as reserved working capital, in the absence of fraud or bad faith. But when the company ceased to use and undertook to distribute the properties, purchased with surplus earnings accumulated after the formation of the trust, the life tenants were concerned and were entitled to insist upon a proper distribution. Unlike *Matter of Rogers* (161 N. Y. 108), this distribution was made by a going concern. As the integrity of the *corpus* of the trust is thereby in no respect impaired, the stocks in these three companies on distribution should be allotted to the life beneficiaries, within the reasoning of *Matter of Schaefer* (*supra*) and *Matter of Osborne* (*supra*). It follows, of course, that all stock increases of the Colonial Oil Company, Standard Oil Company (California) and Standard Oil Company (Nebraska) acquired by the Standard Oil Company of New Jersey between 1899 and 1911 for cash at par out of its cash earnings accumulated after the formation of the trust should be allotted to the life beneficiaries.

The next question concerns similar stock increases so acquired by the Standard Oil Company of New Jersey between 1899 and 1911 from the Anglo-American Oil Company, Crescent Pipe Line Company, Northern Pipe Line Company, Ohio Oil Company, Southern Pipe Line Company, Standard Oil Company of New York, and Union Tank Line Company, all of which companies were either directly or through stock

control a part of the original *corpus* of the trust. In so far as the distribution of these stocks, paid for out of the accumulated earnings of the company after the formation of the trust, does not entrench in whole or in part upon the capital of the trust as received from the testator, these stocks should be allotted to the life beneficiaries, under the rule in the *Osborne* case. In determining whether such distribution entrenches upon the *corpus* of the trust, each corporation, a share in which constituted a part of the original trust, should be considered separately, and the book value of the stock constituting in part the capital of the trust fund as received from the testator shou'd be ascertained in the manner prescribed in the *Osborne* case. The value of the investment or proportionate interest represented by the original shares after the distribution of December 1, 1911, was made is ascertained by the same method. The difference between the two shows whether there has been any impairment of the *corpus* of the trust represented by the shares of the particular corporation. Similar disposition should be made of the stock dividends declared and paid to the Standard Oil Company of New Jersey between 1899 and 1911 by its subsidiaries, Crescent Pipe Line Company, Indiana Pipe Line Company, Northern Pipe Line Company, Southern Pipe Line Company and Vacuum Oil Company.

A volume could be written on this aspect of the case, but a discussion of the matter and an analysis of the numerous cases dealing with varying aspects of the problem as the law has developed in this and other jurisdictions would serve no useful purpose, for, after all is said, the basic and determining inquiry is whether on a distribution of stocks acquired out of and representing surplus earnings after the formation of the trust an allotment thereof to the life tenants would entrench upon the *corpus* of the original trust. Apportionment on this simple basis is fair to both remaindermen and life tenants, is workable and tends to carry out the intention of the testator.

Further questions arise with respect to extraordinary distributions made since December 1, 1911, by corporations whose shares were distributed by the Standard Oil Company of New Jersey in December, 1911.

Stock dividends were declared by ten companies and

should go, subject to the rule of apportionment in the *Osborne* case, to the life beneficiaries. Similarly with the stock dividend declared by the Standard Oil Company of Ohio, declared but not paid on the date of the trustee's last supplemental account.

Two companies, the South Pennsylvania Oil Company and the Standard Oil Company (California) offered to stockholders rights to subscribe for additional stock at par. The learned referee, erroneously as we think, allotted these rights to the life beneficiaries. It has been uniformly held in this State that new shares of stock purchased by trustees in the exercise of subscription rights given to stockholders of the corporation, and the proceeds of the sale of such subscription rights, should be allotted to the principal of the trust and that the life tenant is not entitled thereto. (*Matter of Kernochan*, 104 N. Y. 618; *Stewart* v. *Phelps*, 71 App. Div. 91; 173 N. Y. 621; *Robertson* v. *de Brulatour*, 188 id. 301; *Richmond* v. *Richmond*, 123 App. Div. 117; affd., 196 N. Y. 535.) It is contended that these cases have been overruled by the decisions made in *Matter of Harteau* (204 N. Y. 292) and *Matter of Osborne* (*supra*). In the *Harteau* case there was no question between remaindermen and life tenant. There was an extraordinary dividend of 100 per cent declared by a corporation upon its capital stock, shares of which were held by the trustees. The dividend was paid in cash and the trustees invested it in new stock of the corporation, to which as stockholders they had subscription rights, and the new stock thus purchased sold at a profit. The court treated the proceeds of sale as a dividend and apportioned it between principal and income. No question was raised in the case in any of the courts as to subscription rights or whether such rights should be treated as income of the trust estate. So far as the *Osborne* case is concerned, as has been already pointed out, this decision did not enlarge the rights of life tenants but materially limited and curtailed them. There seems to be, therefore, no reason for departing from the previously settled rule. These subscription rights should be allotted to the principal of the trust.

The Standard Oil Company of Kentucky on December 22, 1913, declared a cash dividend of $200 per share payable to

the stockholders of record at the close of business January 31, 1914, and as a part of the same resolution of the board of directors the increased capital stock of the company to the amount of $2,000,000 was offered to stockholders of record at the close of business January 31, 1914, at par in proportion to the stock then owned by them and the stockholders were authorized to pay for the same " by applying the cash dividend declared this day." It is to be noted that while the cash dividend and rights to subscribe accrued simultaneously, no condition was attached which required the stockholders to use the cash dividends to purchase the new stock. If the rights to subscribe had been given to stockholders without a cash dividend being declared at the same time, those rights would have belonged to capital, under the *Richmond* case. The legal character of those rights is not altered nor is the interest of capital in those rights changed by the fact that at the same time a cash dividend was declared sufficient in amount to pay for the new stock offered to the stockholders. If the trustee used the cash dividend to purchase the new stock and then subsequently sold the stock at a profit to the estate a disposition of this profit would be settled by *Matter of Harteau, i. e.,* it would go to the life tenant. But merely because the dividend is declared and the subscription rights offered at the same time the rule of apportionment as to the subscription rights declared by the *Richmond* case, and as to the cash dividends, declared by the *Osborne* case, is not to be changed. This cash dividend should be apportioned under the *Osborne* case and the subscription rights allotted to the capital of the trust. Similarly with the subscription rights and cash dividends of the Title Guarantee and Trust Company.

A still further question as to subscription rights is raised by the Vacuum Oil Company having on April 4, 1912, offered the right to subscribe at par for 500 per cent of holdings of stock of that company and Swan & Finch Company having on August 14, 1912, offered the right to subscribe at par for 400 per cent of holdings of stock of that company. The referee has treated this as practically an extraordinary dividend or division of the surplus assets of those companies and allotted the rights to income. This was error, for it is

settled that the subscription rights belonged to capital. It can make no difference in principle merely because the right inuring to the holders of the stock is more valuable. Neither does this constitute a distribution of assets. It merely changes the outstanding number of shares representing the assets. The right is a valuable one and properly goes with the ownership of the shares because if it were not given and exercised the holder's proportion of interest in the assets of the company would be materially altered for the worse.

It remains to deal with two other distributors of stock, one by the Ohio Oil Company, which on February 1, 1915, distributed stock of the Illinois Pipe Line Company; the other by the Prairie Oil and Gas Company which on March 22, 1915, distributed stock of the Prairie Pipe Line Company. Prior to the decision of the *Pipe Line Cases* in 1914 (234 U. S. 548) the Ohio Oil Company and the Prairie Oil and Gas Company carried their pipe line properties in direct ownership. The Prairie Oil and Gas Company was incorporated in 1900. The Ohio Oil Company, however, was organized in 1887 and its entire capital stock was purchased by the National Transit Company in 1889. Accordingly the testator had an interest in the Ohio Oil Company, represented by his shares in the National Transit Company which were a part of the original *corpus* of the trust. Similarly with respect to the Prairie Oil and Gas Company, the trustees had an interest in it from shortly after its organization, growing out of the fact that all of its stock was taken by the Forest Oil Company, one of the twenty original companies in the *corpus* of the trust, which company in 1902 transferred it to the National Transit Company, which held it down to the distribution in 1911. After the decision in the *Pipe Line Cases*, which declared pipe line companies to be common carriers, the Ohio Oil Company and the Prairie Oil and Gas Company, in order to avoid regulation by the Interstate Commerce Commission, decided to separate from themselves and place in a separate ownership the pipe line properties. The Ohio Oil Company, therefore, caused the Illinois Pipe Line Company to be formed with a capital stock of 200,000 shares, of the par value of $20,000,000, and sold to it all of its pipe line properties in return for the whole

capital stock of the Illinois Pipe Line Company. The Prairie Oil and Gas Company carried out a similar operation, transferring its pipe line properties to the Prairie Pipe Line Company in exchange for the entire capital stock of that company. Both the Ohio Oil Company and the Prairie Oil and Gas Company then distributed the stock of the newly-organized pipe line companies among their stockholders *pro rata*. In this manner the stock came into the hands of the National Transit Company, which made the distribution of 1911. The learned referee has allotted these pipe line shares to the life tenants. In so doing we think he erred. The stocks of the pipe line companies were not distributed by the Ohio Oil Company and the Prairie Oil and Gas Company as a dividend and were in no sense a dividend. All that the jugglery resorted to did was to segregate a part of the capital assets of each company, place the same in the ownership of separate corporations, retaining, however, in the hands of the National Transit Company, the owner of the stock of all the corporations, the same proportionate interest in the assets of each that it had before the transaction. When, therefore, the Ohio Oil Company, for example, whose stock was owned by the National Transit Company, transferred its pipe lines for the *entire* capital stock of the pipe line company and then turned the stock of the pipe line company over to the National Transit Company, there was no change whatever in the interest that the National Transit Company theretofore had in the properties owned by the Ohio Oil Company. The testator owned shares in the National Transit Company, and his share in the assets of these companies, represented by his stock in the National Transit Company, was a part of the original *corpus* of the trust. To allot the pipe line shares to the life beneficiaries would be tantamount to transferring to them a part of the original property in the trust and would violate the fundamental rule requiring the integrity of the trust to be preserved.

One final question remains, namely, the dates to be taken for making the calculations necessary for the apportionment of the dividends declared by the former subsidiary companies of the Standard Oil Company of New Jersey. There are two dates to be determined: (1) The date of the creation

First Department, February, 1918.        [Vol. 181.

or establishment of the trust, as to which the book value of the securities constituting the principal must be computed to ascertain the original intrinsic value of the shares in the several companies; and (2) the date to be taken for the purpose of ascertaining whether the capital of the trust will be impaired to any extent by extraordinary dividends declared. The life beneficiaries argue that the first date taken should be the date of the testator's death in February, 1899. The trustee claims and the referee has found that the first date should be May 10, 1899, upon which date it is agreed that the trustee received the securities from the executrix. We agree with the referee that the correct date to be taken is May 10, 1899, when the securities came into the hands of the trustee. This is indicated by Judge CHASE in *Matter of Osborne* (p. 485). As to the second date, the trustee urges that it be fixed as of the time of the distribution of December 1, 1911, irrespective of when the dividends were declared. This would doubtless save many complications but does not appear to be sound. If there is any impairment by reason of the declaration of an extraordinary dividend the impairment exists when the dividend is declared. The second date to be taken is that fixed by the referee, namely, the date of the declaration of the dividend. This was also plainly indicated by Judge CHASE in *Matter of Osborne* where, after saying that the intrinsic value of the trust investment is to be found as " existing at the time of the creation of the trust," he said: " The value of the investment represented by the original shares *after the dividend has been made* is ascertained by exactly the same method."

The judgment should, therefore, be modified by allotting to the principal of the trust fund instead of to the life beneficiaries (1) the stocks of the thirty-three companies received by the plaintiff from the Standard Oil Company of New Jersey to December, 1911, except, (a) the stocks and stock increases of the Colonial Oil Company, Standard Oil Company (California) and Standard Oil Company (Nebraska); (b) stock increases acquired by the Standard Oil Company of New Jersey between 1899 and 1911 from the Anglo-American Oil Company, Crescent Pipe Line Company, Northern Pipe Line Company, Ohio Oil Company, Southern

Pipe Line Company, Standard Oil Company of New York and Union Tank Line Company; (c) stock dividends declared and paid to the Standard Oil Company of New Jersey between 1899 and 1911 by its subsidiaries Crescent Pipe Line Company, Indiana Pipe Line Company, Northern Pipe Line Company, Southern Pipe Line Company and Vacuum Oil Company; (2) stock subscription rights declared and offered subsequent to December 1, 1911; (3) the Illinois Pipe Line Company stock received by plaintiff February 6, 1915; (4) the Prairie Pipe Line Company stock received by plaintiff March 25, 1915; and as so modified the judgment should be affirmed, with costs to all parties who have appeared on this appeal, payable out of the trust fund.

CLARKE, P. J., and LAUGHLIN, J., concurred; PAGE, J., dissented in part; DOWLING, J., dissented.

LAUGHLIN, J. (concurring):

I concur in the opinion of Mr. Justice SHEARN, but notwithstanding the number and length of the opinions written on this appeal I deem it proper to add a few sentences to emphasize my views on the point on which Mr. Justice PAGE and Mr. Justice SHEARN differ.

If the combination of these companies had been legal the investment of the surplus earnings of the constituent companies by the Standard Oil Company of New Jersey in the organization of the Colonial Oil Company and the Standard Oil Companies of California and Nebraska would have remained capital on the theory very lucidly developed and discussed in the opinion of Mr. Justice PAGE. The decree of dissolution evidently proceeded upon the theory that the acts of the Standard Oil Company of New Jersey in representing the various companies whose stock it held were to be deemed valid until the date of the decree, for there was no annulment of the corporations it organized and by the decree of dissolution it was permitted to distribute the stock of all the corporations including those it organized among its shareholders in the proportion to which they were equitably entitled. This presumptively was on the theory that during the period of the illegal combination it was necessary to

First Department, February, 1918.        [Vol. 181.

regard the Standard Oil Company of New Jersey as acting for and representing the constituent companies as agent, and doubtless any other course would have been impracticable. But after the decree of dissolution which decided that the combination was illegal it was no longer competent for the board of directors of the Standard Oil Company of New Jersey, in my opinion, to act for or represent the constituent companies. It was then merely authorized to carry out the decree of dissolution and, therefore, the action of its board of directors can be given only that effect. Undoubtedly, if the constituent companies whose surplus earnings were used in the purchase of this stock had themselves purchased it with their surplus earnings they could have subsequently disposed of it and have distributed the proceeds as dividends, but by operation of the decree that power is now necessarily gone owing to the fact that it severed the relations of the constituent companies. If the decree of dissolution had annulled these three corporations and directed that the assets be returned to the respective companies with whose funds they were organized such assets in the hands of the respective companies to which they would be returned would still remain capital until action by the respective boards of directors authorizing their distribution as dividends; but in that event they might have been distributed as dividends. As already observed that power is gone and forever, and neither the funds nor the stock representing the investment could under the decree of dissolution be returned to the respective companies whose funds were used in the organization of these three companies. We have then a case of the *surplus earnings* of the respective corporations invested in the organization of other corporations and permanently severed from the companies whose funds they were. Under the decree of dissolution which leaves these three companies validly organized no one is now authorized to distribute as dividends the moneys with which the three companies were organized. The investment is no longer beneficial to the companies whose funds were thus invested. They can neither hold these investments as capital, nor distribute them as dividends, and no longer have any ownership in or control over such investments. Those moneys are as definitely and permanently

severed from the respective companies from which they came as if they had been distributed as dividends. Their distribution it is true has not been through action of the respective boards of directors but has been by operation of the decree of dissolution. The *stock*, therefore, of these three companies now coming into the hands of the trustee by virtue of the decree of dissolution represents *surplus* earnings of the companies whose funds were used to organize them and under the decision of this court in *Matter of Schaefer* (178 App. Div. 117) [1] and of the Court of Appeals which affirmed on the opinion of Mr. Justice SCOTT here (222 N. Y. 533), it seems to me they must be deemed to represent surplus earnings to which the life beneficiaries are entitled. In the opinion in that case Mr. Justice SCOTT said: " Where the trust fund consists of corporate stock, the life tenant will ordinarily be limited to receiving only so much of the profits as the corporation sees fit to distribute in dividends, but when the accumulated profits come into the hands of the trustee in any form or manner the life tenant is entitled to receive them." Here the shares in these three companies represent accumulated profits only and have now come into the hands of the trustee. I am of opinion, therefore, that the life beneficiaries are entitled thereto.

PAGE, J. (dissenting in part):

I concur in the opinion of Mr. Justice SHEARN, except as to the disposition of the stock of the Colonial Oil Company, Standard Oil Company (California) and Standard Oil Company (Nebraska). The time, method and purpose of the acquisition of these stocks by the Standard Oil Company of New Jersey are stated in the opinion of Mr. Justice SHEARN and need not be repeated. His conclusion is that such portions of these stocks as were purchased out of the surplus earnings of the Standard Oil Company of New Jersey accumulated prior to the creation of the trust should be allotted to capital, and such as were purchased out of surplus earnings accumulated after the creation of the trust should be distributed to the life beneficiaries. In my opinion, the determining factor is not the time of the accumulation, but the purpose and appropriation of the fund which had been accu-

mulated, whether it consisted of funds permanently reserved for working capital and paid out in the purchase of the stock of these corporations as a means of extending their plant and facilities in producing and distributing their product, or merely as an investment of current profits which were applicable to dividends. If the first, they were capital assets; if the second, they were properly income.

The Standard Oil Company of New Jersey in 1899 filed an amended certificate of incorporation, whereby its capital stock was increased from $10,000,000 to $110,000,000, and upon the issuance of this new stock the various stocks which constituted the *corpus* of the trust estate were exchanged, as has been fully set forth in the opinions of Mr. Justice SHEARN and Mr. Justice DOWLING. This amended certificate of incorporation contained the following provision: "The corporation may use and apply its surplus earnings, in accumulated profits authorized by law to be reserved, to the purchase or acquisition of property and to the purchase or acquisition of its own capital stock from time to time, to such extent and in such manner and upon such terms as its Board of Directors shall determine; and neither the property nor the capital stock so purchased or acquired, nor any of its capital stock taken in payment or satisfaction of any debt due to the corporation, shall be regarded as profits for the declaration or payment of dividends unless otherwise determined by a majority of the Board of Directors or a majority of the stockholders. * * * The Board of Directors shall have power * * * to fix the amount to be reserved as working capital."

On August 1, 1899, the following resolution was adopted by the board of directors of the said company: "*Resolved,* that all of the accumulated profits of the Company to this date, in excess of the amount required to pay dividends of 1½% on the preferred and 5% on the outstanding common stock be reserved as working capital." In 1901 (N. J. Laws of 1901, chap. 110, amdg. N. J. Laws of 1896, chap. 185, § 47) the Corporation Law of New Jersey was amended to provide: " Unless otherwise provided in the original or amended certificate of incorporation, or in a by-law adopted by a vote of at least a majority of the stockholders, the directors of every

corporation created under this act shall, in January in each year, after reserving over and above its capital stock paid in, as a working capital for said corporation, such sum, if any, as shall have been fixed by the stockholders, declare a dividend among its stockholders of the whole of its accumulated profits exceeding the amount so reserved, and pay the same to such stockholders on demand." (See 2 Comp. Stat. 1629, § 47.) The extract from the amended certificate of incorporation (*ubi supra*) gave the right to the directors to determine the extent to which surplus earnings should be reserved, and that profits so reserved and the extent to which they should be applied in the purchase of property or stock, or the property or stock so purchased, should not be regarded as profits for the declaration of dividends unless otherwise determined by a majority of the directors or a majority of the stockholders. On November 17, 1902, the board of directors adopted a resolution declaring a dividend of one and one-half per cent on the preferred stock and ten per cent on the common stock, and further " *Resolved,* that all of the accumulated profits to this date in excess of the amounts required to pay dividends of one and one-half (1½%) per cent on the preferred stock and ten dollars ($10) per share on the outstanding common stock be reserved as working capital." Since November 17, 1902, each of the regular dividends declared by the said company has been authorized in the foregoing form, except that since August 15, 1911, such resolutions have contained no reference to preferred stock.

The referee has found " That between 1899 and the distribution of stock in 1911, refineries at new points were established, large additions were made to the system of pipe lines and a number of new companies were organized and transfers of property and marketing facilities made between the different companies. The business which at the time of the distribution of stock in 1911 was carried on by the Standard Oil Company of New Jersey and its subsidiaries was the outgrowth and continuation of the same business which at the time of the execution of the trust agreement of 1882 was carried on by or through companies or limited partnerships named in the trust agreement, and which at least from the

date of said agreement was conducted as a unified or common business. The individuality of each of the affiliated corporations or organizations was scrupulously maintained, their accounts were kept entirely separate and distinct, all business transactions were transactions of the different organizations severally, but the good of the whole was sought rather than the advancement of any single organization at the expense of the whole. New refineries were established and existing refineries enlarged or abandoned, pipe lines constructed, producing properties acquired or developed, and other facilities acquired or created according to the requirements of the business as an entirety. New corporations were organized or existing corporations utilized as instrumentalities for the convenient transaction of the business, and the plants and properties employed in the business were vested in such corporations and from time to time transferred from one corporation to another as convenience required, and all the funds employed in the business were utilized by the management as a common fund out of which all amounts requisite for. construction and development by the several companies were supplied, each organization being debited or credited with the respective amounts advanced or borrowed and interest being duly debited and credited thereon."

Thus it would appear that the reserve for working capital authorized by the amended certificate of incorporation of the Standard Oil Company of New Jersey was used for the development and extension of the plant and facilities of the company. Where it was deemed best, to accomplish this purpose, to organize a new corporation or to increase the capital of an existing corporation, the entire stock of such corporation, or the increase thereof (the Standard Oil Company of New Jersey holding all the stock theretofore issued), was taken by the Standard Oil Company of New Jersey, and the money paid to the subsidiary corporation was paid out of this reserve for working capital. The stock thus purchased represented such an appropriation of this fund and was an enhancement of capital, the same as it would have been had the money been paid directly for the purchase or erection of the producing, manufacturing or distributing plants. The value of the capital stock of the Standard Oil Company

of New Jersey was enhanced by the value of the stock thus purchased, and the dividends paid to the stockholders were increased by the net earnings of these plants, which were paid to that company upon the stock so acquired. When, therefore, the Standard Oil Company distributed these stocks to its stockholders pursuant to the decree of the United States court, it distributed the stock so acquired as a part of the capital invested in the business. Although the fund from which the money was paid had been accumulated from undistributed profits, these profits had been withdrawn from profits distributable in dividends, pursuant to the authorization in the amended certificate of incorporation, which authorized the directors so to withdraw them, and which further provided that such investments " shall not be regarded as profits for the purpose of declaration or payment of dividends unless otherwise determined by a majority of the Board of Directors or the stockholders." Neither the directors nor stockholders of the said company ever made such a determination. The effect of the decree of the United States court was not to distribute those stocks to the stockholders as dividends, nor did that decree work a dissolution of the corporation or of any of its subsidiaries. The corporations all remained going concerns, carrying on their several business enterprises. The Standard Oil Company was deprived of the co-operation of the subsidiary companies, but still operated such plants as it owned prior to 1899 and the accretions thereto. The subsidiary companies — these three with the others — mentioned in the decree, their officers, directors, agents, servants and employees, were enjoined and prohibited from paying any dividend to the Standard Oil Company on account of the stock held by it, or from allowing the latter company to vote, or to direct the policies or exercise any control whatsoever over the corporate acts of the subsidiary companies. But the Standard Oil Company was not prohibited from distributing ratably to its shareholders the shares to which they were equitably entitled in the stocks of the subsidiary companies.

This is what the Standard Oil Company of New Jersey did. The effect of this was merely to transfer from that company the stocks that it was holding to its stockholders,

thus transferring to the equitable owners of such stock the legal title. A stockholder is the holder of a certificate that he is the owner of a specific share of the joint property and assets that are held by the corporation for all the stockholders. The legal title is in the corporation, but the stockholders are the equitable owners. Therefore, the transfer to the stockholders of the Standard Oil Company of the stock of these subsidiary companies ratably was merely a transfer of the legal title, to that extent, of the common property, so that each became the legal owner of that of which theretofore he had been the equitable owner. This was in no sense a dividend, but a transfer of capital assets. I am aware that Judge CARDOZO has characterized this distribution as "in effect, an extraordinary dividend." (*Matter of Brann,* 219 N. Y. 263, 267, revg. 171 App. Div. 800.) A careful reading of the opinion will show that the question whether this distribution was a dividend was not a determinative factor in the case. The distribution was made in the lifetime of the testatrix, and the question was whether the stock in the subsidiary corporations passed under the bequest of the original stock, or to the residuary legatee; and as was stated in the dissenting opinion in this court: "The method of distribution of the surplus, whether it be called a dividend or not, has no bearing on the case." Whatever it was, "the stock of the subsidiary companies when issued and received by the testatrix became an independent asset of the estate, not in any way attached to or accompanying the original stock" and should be disposed of in accordance with the intent of the testatrix as shown by her will and codicil. (171 App. Div. 809.) The status of the distribution made by the Standard Oil Company clearly was not fixed and settled by the decision of the Court of Appeals in *Matter of Brann (supra)* as that of an extraordinary dividend, as is claimed by the counsel for the life beneficiaries. Nor do I find anything in the cases relied upon by the counsel for the life beneficiaries which is inconsistent with the views that I have expressed in this opinion.

In *Equitable Life Assurance Society* v. *Union Pacific R. R. Co.* (212 N. Y. 360) the Baltimore and Ohio Railroad stock was held merely as an investment of surplus. That road was

not a part of the plant of the Union Pacific, nor was it used to extend the facilities of the latter company. The sole benefit accruing to the Union Pacific from the stock holding was the receipt of dividends on the investment. The distribution of that stock was, therefore, a distribution of surplus that was properly applicable to dividends, and the fact that the distribution was made of the stock itself, rather than in cash that could have been obtained by the sale of the stock, made no difference. The court further recognized that special circumstances might take the case out of " the ordinary rule," which they applied in that case, " of corporate management established by decisions, statutes and business usages that the surplus of these gains or profits beyond what may be necessary to keep good the liability to capital stock which has been issued, *may, in the discretion of a board of directors, be distributed* amongst its stockholders as dividends and returns on their investment." (P. 366.)

In the instant case, as has been shown, special circumstances exist. The stock was purchased from a fund that the certificate of incorporation stated should not be appropriated in the payment of dividends, and the plants of the corporation were used in the business of the Standard Oil Company and were in effect an extension of its own plant and facilities.

In *Matter of Schaefer* (178 App. Div. 117; affd., on opinion of SCOTT, J., 222 N. Y. 533) the surplus had been invested in leases of saloon properties and chattel mortgages on saloon fixtures and on such leases. This was not an investment of working capital in the plant and facilities of the corporation's business. The leases were not secured for the purpose of carrying on business by the corporation in the demised premises, but for the purpose of reletting to others, and the profit, if any, on the investment accrued in the increased rent received, and upon the mortgage loans the corporation received interest on the investment and nothing more. This court held that when the corporation purchased from the trustees the stock, the value of these investments was represented in the price paid for the stock and, in so far as the money so invested was accumulated during the trust period, it should go to the life beneficiaries, for it was taken from a fund

applicable to dividends, and which would have gone to them had it been so distributed.

*Matter of Rogers* (22 App. Div. 428; 161 N. Y. 108), while it dealt with the dissolution of a corporation and hence thus distinguishable in some particulars from the case at bar, is illuminating of points involved in the instant case and goes far to sustain the conclusion that I have reached. The Rogers Locomotive and Machine Works was started in 1838 with a small capital ($300,000). From time to time its plant was increased, until it had large and valuable buildings and plant devoted to manufacturing purposes and an extensive stock of materials on hand. In addition, it had a large fund in cash, bonds and stocks of the United States government, bonds of other corporations, and real estate located in other States. All of the increases in plant and the purchasing of the securities had been made out of accumulated profits. In 1893 another corporation was organized called the Rogers Locomotive Company with an authorized capital of $3,000,000. The old company transferred all its works, buildings, plant, stock on hand and good will for $2,750,000 in the stock of the new company. Thereupon the original company proceeded to liquidate. The directors sold some of the securities and the real estate and from time to time made distribution. The stock in the new company was ratably distributed to the stockholders of the old, and a division in kind was made of the railroad stocks and cash dividends. Altogether there was distributed to the holder of each share of stock in the old company 1,144 per cent in the stock of the new company, 1,000 per cent in cash, and 175 per cent in railroad stock. The testator had died in 1868, creating a trust for certain life beneficiaries with a remainder over in certain shares of stock in the original company. A controversy arose between the life beneficiaries and the remaindermen. It was decided by the surrogate that the stock in the Rogers Locomotive Company was capital; that the cash dividends (except a part, as to which no appeal was taken) and the dividend of railroad stock were income. This decision was affirmed in the Appellate Division and the Court of Appeals. In the course of the opinion the latter court said (p. 113): " What then is capital and what is profits? In a manufacturing business a

plant is of first importance, and as the business increases an enlargement thereof, with the necessary tools, fixtures and machinery, is one of the things to which the earnings of the company may properly be devoted. This must be deemed to be fairly within the contemplation of the testator in creating the trusts with the capital stock of this company. After the plant, there arises a necessity for raw material and labor to manufacture it. This requires what is usually termed a working capital, and it, of necessity, varies in amount depending upon the magnitude of the business. It must, therefore, also have been within the contemplation of the testator that a reasonable amount would be retained by the directors for this purpose. The sale of the plant, as we have seen, included the stock of raw material on hand and that in the process of manufacture, and we must assume that the sum obtained from such sale included so much of the working capital as was necessary for the procurement of raw material. * * * The appellants claim that all of the assets were necessary, but this we cannot admit. It is very clear that the investment in government bonds, railroad stocks, and lands in the western States was not capital employed in the business of the corporation, and, consequently, was not necessary as a working capital. * * * We incline to the view that substantial justice has been done the parties by the order appealed from and that it should be affirmed."

In *Robertson* v. *de Brulatour* (188 N. Y. 301), while the cash distributed was realized in part from the sales of real estate no longer necessary in the company's business, it was held that the sale did not create the surplus nor affect it as an item in the account of assets and liabilities, but that the sales of real estate and securities to the extent that they were made assets, were liberated, and the cash accumulated was a cash surplus which the directors could, in the exercise of their discretion, distribute among the stockholders.

The case of *Williams* v. *Western Union Telegraph Co.* (93 N. Y. 162) was an action brought by a stockholder to restrain the company from issuing stock to purchase stock in certain other telegraph companies, and distributing a stock dividend. The counsel for the life beneficiaries quotes lengthily from pages 191 and 192 of the opinion. But as this case

dealt with the rights of directors to declare dividends, when questioned by a dissenting stockholder, there is nothing in it that throws any light on the consideration of the case at bar.

I have no quarrel with the portion of the opinion cited by my brother SHEARN from *Smith* v. *Dana* (77 Conn. 543, 554), although the holding in that case that stock dividends irrevocably fix the status of the surplus thus capitalized, and that such dividend goes to the capital of the trust, irrespective of the time when the surplus was accumulated, is contrary to the rule in this State. I do not question the right or the power of a majority of the directors of the Standard Oil Company to have abandoned these subsidiary companies and sold them, or to have distributed the fund reserved for working capital in cash, for such right was expressly given by the amended certificate of incorporation of the company. But by that certificate it was also provided that out of profits they might reserve a fund for working capital, and it was within their discretion to expend this money in the purchase or enlargement of the plant and facilities of the company, which they did directly and through the organization or purchase of other companies subsidiary and auxiliary to the corporation. The amended certificate provided that such property and such fund should not be applicable to or distributable as dividends, unless a majority of the directors or a majority of the stockholders so voted.

In my opinion, until such action, the investment is and must be deemed to be a capital investment, and when without such vote the stock of the subsidiary companies under consideration herein was transferred to the stockholders, it was a distribution not of surplus, not by way of dividend, but of an aliquot part of the capital assets of the corporation, of which theretofore they had been the equitable owners and thereby became the legal owners. Therefore, when the trustees received this stock it was their duty to hold it as a part of the capital of the trust estate, paying over to the life beneficiaries the income therefrom, which theretofore had been received and paid over as a part of the dividends of the Standard Oil Company, but which now is paid directly from the subsidiary company to the trustee. The removal of an intermediate conduit through which the income had been received has not,

in my opinion, changed the whole character of the stock holding.

To my mind this works not alone substantial justice, but gives effect to the intention of the testator and is entirely in harmony with the controlling principle of *Matter of Osborne* (209 N. Y. 450). We have held in *Baker* v. *Thompson* (181 App. Div. 469), decided herewith, that the rules in that case are applicable to a distribution of surplus of the corporation by dividend or otherwise, but not to capital assets. That there may be large accretions of capital by increase of plant and facilities which, although paid for out of income, are not distributable as dividends, and which when paid to a trustee become a part of the capital of the trust, was distinctly held in *Matter of Rogers* (*supra*), and was declared by the court to work substantial justice and to give effect to the intention of the testator — which was that the income should go to the life beneficiary, but that the principal should go to the remainder-men. In the instant case, by the result which, in my opinion, should be adopted, the parties would be left exactly in the position they have been. The income from these subsidiary stocks would be paid to the life beneficiaries by the trustees, who will receive it directly from the subsidiary companies, instead of in the form of dividends from the Standard Oil Company, and the stock of the subsidiary companies- will be held by the trustees instead of by the Standard Oil Company. The rule in the *Osborne* case was adopted to prevent the appropriation by the life beneficiary of accretions to capital which had resulted from income received and not distributed prior to the creation of the trust. It should not be applied to allow the appropriation by the life beneficiary of other legitimate accretions to capital after the creation of the trust. The book value of the stock at the time of the creation of the trust is not to be adopted as the fixed value of the capital, which cannot thereafter be increased in any manner whatsoever.

For the reasons above given, I am of opinion that these shares of stock in the Colonial Oil Company, the Standard Oil Company of California, and the Standard Oil Company of Nebraska, should be held as a part of the capital of the trust, and not distributed in whole or in part to the life beneficiaries.

DOWLING, J. (dissenting):

There is no dispute as to the facts herein, which are set forth in detail in the report of the referee. So far as they are material to these appeals, they may be summarized as follows:

Charles F. G. Heye died on February 8, 1899, leaving a will which was admitted to probate on February 17, 1899. He left surviving him his wife, Marie Antoinette Heye, to whom letters testamentary were issued, and two children — Marie Antoinette Lawrence Heye (now Marie Heye Clemens) and George Gustav Heye. By his will he gave his residuary estate to the United States Trust Company of New York as trustee and directed that it be divided into three equal parts. The trustee was to pay and apply the net income of one part to the use of his wife, Marie Antoinette Heye, during her life; the principal was to go to such persons as she might appoint by will, and in default of appointment to his children in equal shares. The net income of one part was to be applied to the use of testator's daughter, Marie Antoinette Lawrence Heye, during her life, and upon her death leaving issue the principal was to go to such issue *per stirpes*. Her children now living are the infant defendants Dorothy Heye Clemens and Marie Antoinette Wagener Clemens. The net income of the third part was to be applied to the use of testator's son, George Gustav Heye, until he should reach twenty-eight years of age. On his reaching that age $150,000 was to be paid over to him and the balance held in trust until he should be thirty; then all of this balance except $100,000 was to be paid over to him and the balance ($100,000) was to remain in trust for him and the income to be applied to his use for the rest of his life. On his death all of the share of the residuary estate then held in trust for him was given to his issue. He attained the age of twenty-eight on September 16, 1902, and the age of thirty on September 16, 1904. His children now living are the infant defendants Mildred Agnes Heye and Lawrence William Heye.

Marie Antoinette Heye, the widow of the testator, died on the 18th day of February, 1915, leaving a will by which she exercised the power of appointment given her by the will of her husband and directed that the trustee should continue to hold one-half of the property, subject to such

power in trust, during the life of Marie Heye Clemens, paying the net income to her use; and on her death it should pay over the principal to such persons as she might appoint by will, and, in default of appointment, to her issue; and she further directed that the trustee should continue to hold the other one-half of said property during the life of George Gustav Heye, paying the net income to his use and on his death it should pay over the principal as he might appoint by will, and, in default of appointment, to Marie Heye Clemens, or to her issue.

The plaintiff on May 10, 1899, received from Marie Antoinette Heye, the executrix of the will of Charles F. G. Heye, certificates for shares and fractional shares of stock in twenty companies whose stocks were distributed by the trustees of the Standard Oil Trust subsequent to the dissolution of the trust in 1892, as follows:

|  | Shares. | Fractional shares. |
|---|---|---|
| Anglo-American Oil Co., Limited... | 98 | 895000 /972500 |
| The Atlantic Refining Co.......... | 190 | 225000 /972500 |
| The Buckeye Pipe Line Co......... | 760 | 900000 /972500 |
| Eureka Pipe Line Co.............. | 190 | 225000 /972500 |
| Forest Oil Company.............. | 209 | 247500 /972500 |
| Indiana Pipe Line Co............. | 76 | 90000 /972500 |
| National Transit Co.............. | 1,936 | 924800 /972500 |
| New York Transit Co............. | 190 | 225000 /972500 |
| Northern Pipe Line Co........... | 38 | 45000 /972500 |
| The North Western Ohio Nat. Gas Co. | 124 | 714500 /972500 |
| The Ohio Oil Co................. | 304 | 360000 /972500 |
| The Solar Refining Co........... | 19 | 22500 /972500 |
| Southern Pipe Line Co........... | 190 | 225000 /972500 |
| South Penn Oil Co............... | 95 | 112500 /972500 |
| Standard Oil Co. (Indiana)........ | 38 | 45000 /972500 |
| Standard Oil Co. (Kentucky)....... | 38 | 45000 /972500 |
| Standard Oil Co. (New Jersey)..... | 380 | 450000 /972500 |
| Standard Oil Co. of New York..... | 266 | 315000 /972500 |
| Standard Oil Co. (Ohio).......... | 133 | 157500 /972500 |
| Union Tank Line Co.............. | 133 | 157500 /972500 |

The certificates above mentioned represented the equivalent of $370,000 par value of so-called Standard Oil Trust certifi-

cates which had been owned by the testator and surrendered by him to the trustees of the Standard Oil Trust pursuant to a plan to dissolve the said trust.   The Standard Oil Trust had been created by agreements dated January 2 and 4, 1882, by which the stock of certain companies theretofore held by certain individuals and corporations for common account were transferred to certain persons as trustees who issued certificates of beneficial interest therein to the beneficial owners of said stocks.

Upon the dissolution of the trust a majority of the stocks held by the trustees in the twenty companies above named were distributed ratably to the holders of the trust certificates as fast as they surrendered their trust certificates or made application for their distributive shares of. stock.   Slightly less than a majority of the holders of the trust certificates did not surrender or make application for their distributive shares until after the Standard Oil Company (New Jersey) in 1899 adopted the resolution hereinafter mentioned.   Meanwhile the stocks of the companies which had been distributed were not dealt in separately but the unit of trading was the proportionate interest in the several companies either equivalent to or represented by trust certificates, the result of which was that at all of the times mentioned the proportionate interest of the stockholders in each of the twenty companies remained the same as though the trust had not been dissolved.

In the year 1899 the capital stock of the Standard Oil Company (New Jersey), one of said corporations above named, was increased from 100,000 shares of the par value of $10,000,000 to 1,100,000 shares of the par value of $110,000,000, of which 1,000,000 shares were common stock and 100,000 shares were preferred stock, the stock previously outstanding being converted into preferred stock, and the officers of that corporation were duly authorized to issue said certificates of common stock in purchase of the stock of the remaining nineteen of said corporations and its own preferred stock at the rate of one share of such common stock for shares or various fractional shares of the stock of such other corporations and of its preferred stock, and the plaintiff on or about August 11, 1899, surrendered to the said Standard Oil Company (New Jersey) the said certificates of stock of the

said twenty corporations above mentioned and received in exchange therefor 3,700 shares of the common stock of the Standard Oil Company (New Jersey).

The plaintiff in dividing said residuary estate of Charles F. G. Heye into three equal parts as directed by his will allotted 1,234 shares of the said common stock of the Standard Oil Company (New Jersey) to the trust created by the will of said Charles F. G. Heye for the benefit of Marie Antoinette Heye, and 1,233 shares of said stock to the trust created for the benefit of Marie Antoinette Lawrence Heye, now the defendant Marie Heye Clemens, and 1,233 shares of said stock to the trust created for the benefit of George Gustav Heye. As trustee for Marie Antoinette Heye it has ever since held and continues to hold the 1,234 shares of the stock of the Standard Oil Company (New Jersey), allotted as aforesaid to the trust created for her benefit; and as trustee for the benefit of Marie Heye Clemens it has ever since held and continues to hold the 1,233 shares of said stock allotted as aforesaid to the trust created for her benefit; but as trustee for the benefit of George Gustav Heye, it had, prior to the 1st day of September, 1911, duly disposed of all of the 1,233 shares of stock allotted as aforesaid to the trust created for his benefit, with the exception of 47 shares, and on September 1, 1911, it held as such trustee 47 shares of stock, which it has since continued to hold.

The aggregate amount of common stock issued by the Standard Oil Company (New Jersey) between 1899 and December 1, 1911, in exchange for stocks of the other nineteen corporations and its own preferred stock as aforesaid and also in acquiring additional shares of certain other corporations was 983,383 shares. All its preferred stock had been retired by the last-mentioned date.

In 1906 the United States brought suit under the Sherman Law (26 U. S. Stat. at Large, 209, chap. 647) against the Standard Oil Company (New Jersey), the companies whose stocks had been acquired by it by the issue of its own stock in exchange therefor as aforesaid and against a number of other companies whose stocks had been acquired by the Standard Oil Company (New Jersey) or its subsidiary companies at other times and against various individuals.

(*United States* v. *Standard Oil Co.*, 173 Fed. Rep. 177.) This suit, after an appeal to the United States Supreme Court from the decree originally entered, resulted ultimately in a final decree entered in 1911 in the United States Circuit Court for the Eastern Judicial District of Missouri. This decree adjudged that the Standard Oil Company (New Jersey) and other companies enumerated in section 2 of said decree had entered into and were carrying out a combination or conspiracy in restraint of trade and commerce in petroleum and its products among the several States, in the territories and with foreign countries, and were monopolizing a substantial part of such commerce, all in violation of the so-called Sherman Law. The decree further declared that the stocks of the various corporations so named in section 2 were held by the Standard Oil Company (New Jersey) by virtue of such an illegal combination and it accordingly enjoined the Standard Oil Company (New Jersey), its directors, officers, etc., from voting any of the stock in any of said subsidiaries and from exercising or attempting to exercise any control, direction, supervision or influence over the acts of these subsidiaries by virtue of its holding of their stock. This decree in section 5 thereof thereupon continues as follows: " And these subsidiary companies, their officers, directors, agents, servants and employees are, and each of them is, enjoined and prohibited from declaring or paying any dividends to the Standard Company on account of any of the stock of these subsidiary companies held by the Standard Company, and from permitting the latter company to vote any stock in, or to direct the policy of, any of said companies, or to exercise any control whatsoever over the corporate acts of any of said companies by virtue of such stock, or by virtue of the power over such subsidiary corporations acquired by means of the illegal combination. But the defendants are not prohibited by this decree from distributing ratably to the shareholders of the principal company the shares to which they are equitably entitled in the stocks of the defendant corporations that are parties to the combination."

On appeal to the Supreme Court of the United States the decree of the Circuit Court was affirmed on May 15, 1911 (*Standard Oil Co.* v. *United States*, 221 U. S. 1), with

the modifications, (1) that in view of the magnitude of the interests involved and their complexity, the delay of thirty days allowed for executing the decree was too short and should be extended so as to embrace a period of at least six months; and (2) that in view of the possible serious injury which might result to the public from an absolute cessation of interstate commerce in petroleum and its products, by such vast agencies as those embraced in the combination, the defendants should not be enjoined from engaging or continuing in commerce among the States or in the territories of the United States for a similar period of six months. This period of six months dated from June 21, 1911. The provisions of the decree in question, while not making it compulsory, left it open to the Standard Oil Company (New Jersey) to distribute ratably to its stockholders the shares of the corporations adjudged to have been parties to the illegal combination. Accordingly the board of directors of the Standard Oil Company (New Jersey) on July 28, 1911, adopted the following resolutions:

" WHEREAS, to execute and carry into effect the final decree in the case of the United States of America against the Standard Oil Company (of New Jersey) and others, it is necessary to distribute ratably to the stockholders of this Company the shares of stock of various corporations mentioned and described in such decree, owned by this Company either directly or through its ownership of stock of the National Transit Company, which corporations are as follows [here follow the names of the thirty-three corporations whose stocks were distributed].

" *Resolved,* that the shares of stock of each of said corporations owned by this Company be distributed ratably to the stockholders of this Company of record on the first day of September, 1911, and that the shares of stock of the Cumberland Pipe Line Company and the Prairie Oil and Gas Company to which this Company will be entitled upon the distribution thereof by the National Transit Company to its stockholders, be likewise distributed ratably to the stockholders of this Company of record on the first day of September, 1911.

" *Resolved,* that the National Transit Company be, and it hereby is authorized and requested to distribute ratably

to its stockholders of record on the first day of September, 1911, the shares of stock of the Cumberland Pipe Line Company and of the Prairie Oil & Gas Company which it owns, and to make in connection therewith such reduction in its capital stock as may be rendered necessary by such distribution."

The distribution so ordered was made and the shares of the thirty-three enumerated corporations were accordingly distributed ratably to the stockholders of the Standard Oil Company (New Jersey). Plaintiff received certain of these stocks as trustee (1) of the trust for the benefit of Marie Antoinette Heye; (2) of the trust for the benefit of Marie Heye Clemens; (3) of the trust for the benefit of George Gustav Heye. The factor of division being 983.383, there were fractional shares of the stock of each corporation assigned to the respective funds. Omitting these fractions, the shares received from the trust for the benefit of Marie Antoinette Heye were as follows:

1,234 shares Anglo-American Oil Company, Ltd.
  62 shares Atlantic Refining Company.
   2 shares Borne Scrymser Company.
 250 shares Buckeye Pipe Line Company.
   3 shares Chesebrough Manufacturing Company.
   3 shares Colonial Oil Company.
   3 shares Continental Oil Company.
  75 shares Crescent Pipe Line Company.
  12 shares Cumberland Pipe Line Company, Inc.
  62 shares Eureka Pipe Line Company.
  21 shares Galena Signal Oil Company, preferred.
  70 shares Galena Signal Oil Company, common.
 125 shares Indiana Pipe Line Company.
 638 shares National Transit Company.
  62 shares New York Transit Company.
  50 shares Northern Pipe Line Company.
 752 shares Ohio Oil Company.
 225 shares Prairie Oil and Gas Company.
   6 shares Solar Refining Company.
 125 shares Southern Pipe Line Company.
  31 shares South Penn Oil Company.
  43 shares South West Pennsylvania Pipe Lines.

313 shares Standard Oil Company (California).
12 shares Standard Oil Company (Indiana).
12 shares Standard Oil Company (Kansas).
12 shares Standard Oil Company (Kentucky).
7 shares Standard Oil Company (Nebraska).
188 shares Standard Oil Company of New York.
43 shares Standard Oil Company (Ohio).
1 share Swan & Finch Company.
150 shares Union Tank Line Company.
31 shares Vacuum Oil Company.
8 shares Washington Oil Company.
3 shares Waters-Pierce Oil Company.

The trust estate for the benefit of Marie Heye Clemens received 1,233 shares of the Anglo-American Oil Company, Ltd., and proportionate amounts of all the other stocks. The trust estate for the benefit of George Gustav Heye received 47 shares of Anglo-American Oil Company, Ltd., and proportionate amounts of all the other stocks. The certificates representing the trustee's shares in these corporations other than the Anglo-American Oil Company, Ltd., were received by the trustee on or about December 1, 1911, and the stock of the Anglo-American Oil Company, Ltd., in January, 1912.

The thirty-three corporations whose shares were so distributed by the Standard Oil Company (New Jersey) comprised shares in seventeen out of the nineteen corporations whose shares were acquired by the Standard Oil Company (New Jersey) in 1899. The Forest Oil Company, one of the remaining two corporations, had been absorbed by the South Penn Oil Company in 1902, and the stock of the North Western Ohio Natural Gas Company was not directed to be distributed by the above resolution. The remaining sixteen corporations whose stocks were so distributed comprised the following:

Eight companies whose stocks were owned by the Standard Oil Company (New Jersey) in 1899 and prior to the testator's death as follows:

Borne Scrymser Company,
Chesebrough Manufacturing Company,
Continental Oil Company,
Galena Signal Oil Company (representing the consolidation of Galena Oil Company and Signal Oil Company),

Standard Oil Company (Kansas),
Swan & Finch Company,
Vacuum Oil Company,
Waters-Pierce Oil Company.

Three companies whose stocks had been acquired by the Standard Oil Company (New Jersey) out of its cash earnings subsequently to 1899, as follows:

Colonial Oil Company,
Standard Oil Company (California),
Standard Oil Company (Nebraska).

Two companies whose stocks were acquired by the Standard Oil Company (New Jersey) subsequently to December, 1899, from its subsidiaries as follows:

South West Pennsylvania Pipe Line Company,
Washington Oil Company,
Crescent Pipe Line Company.

Two companies whose stocks were distributed by the National Transit Company in 1911 pursuant to the above resolution:

Cumberland Pipe Line Company.
Prairie Oil and Gas Company.

In the case of some of the subsidiary corporations whose stocks were acquired by the Standard Oil Company (New Jersey) in 1899 in exchange for its common stock, or were theretofore held by it, its holdings were increased therein between 1899 and 1911 by its purchase of increases of capital stock of such subsidiaries issued for cash at par, and through stock dividends declared and paid by them. Thus the Standard Oil Company (New Jersey) had between 1899 and 1911 bought for cash at par out of its own earnings stock in eleven subsidiary companies of the aggregate par value of $60,650,000, which it carried on its own books at an aggregate book value of $71,503,765 as of December 1, 1911, and which the subsidiary companies carried on their books as of an aggregate book value of $127,237,375 on December 31, 1911. These companies were: Anglo-American Oil Company, Colonial Oil Company, Crescent Pipe Line Company, Northern Pipe Line Company, Ohio Oil Company, Southern Pipe Line Company, Standard Oil Company of California, Standard Oil

Company of Kansas, Standard Oil Company of Nebraska, Standard Oil Company of New York and Union Tank Line Company. Stock dividends were also declared and paid to the Standard Oil Company (New Jersey) by certain of the subsidiaries (Crescent Pipe Line Company, Indiana Pipe Line Company, Northern Pipe Line Company, Southern Pipe Line Company, and Vacuum Oil Company) between 1899 and 1911, of the par value of $12,975,000, whereof the book value on December 1, 1911, according to the books of the Standard Oil Company (New Jersey) was $18,367,870, and whereof the book value on December 31, 1911, according to the books of the subsidiary companies was $26,330,837. The book value on the books of the Standard Oil Company (New Jersey) at which the stocks distributed on December 1, 1911, and the Anglo-American Oil Company, Ltd., stocks were carried, was $280,121,948.62. These distributions were entered on the company's journal vouchers as follows:

"JOURNAL VOUCHER.
" No. 217                         NEW YORK, *December 1st*, 1911.
" Charge.
    " Reserved Profits
        " To distribute ratably to stockholders of record Sept. 1st,
            1911, the stocks owned and held by this Company
            as per attached list in accordance with the opinion
            and order of the Supreme Court of the United States,
            May 15th, 1911, and resolution of Board of Directors,
            July 28th, 1911................. $268,856,501 00
" Credit
    " Sundry Stock Accounts as per attached
        list............................ $268,856,501 00
                    " Approved,
" Entered                    (Signed)    C. G. FAY,
" Jour. Folio 87.                    *Assistant Comptroller.*"

"JOURNAL VOUCHER.
" No. 17                         NEW YORK, *Jany. 20th*, 1912.
" Charge
    " Reserved Profits
        " To distribute to stockholders of record Sept. 1st, 1911,
            in accordance with the opinion and order of the

First Department, February, 1918.          [Vol. 181.

Supreme Court of the United States May 15th, 1911, and Resolution of Board of Directors July 28th, 1911, Stock of Anglo-American Oil Co. Lim., on basis of One (1) Share Warrant of £1. for each share of Standard Oil Co.................  $11,265,447· 57

" Credit

" Anglo-American Oil Co. Limited, Share Warrants, 983,383 Share Warrants...  $11,265,447 57

" Approved,

" Entered                    (Signed)          C. G. FAY,
" Jour. Folio 7.                              *Assistant Comptroller.*"

Whenever the stock of any of the subsidiary companies was increased, subsequently to 1899, and. the increase or any part thereof was issued for cash to the Standard Oil Company (New Jersey), the entry on the books of the latter company was a charge to the stock investment account of the company affected and a credit to the cash account of the Standard Oil Company (New Jersey) for the amount of the disbursement. If such increased stock or part thereof was distributed as a stock dividend and received by the Standard Oil Company (New Jersey), the entry on the Standard Oil Company (New Jersey) books was a charge to the corresponding stock investment account and a credit to the profit and loss account of the investment in the stock of the company making the stock distribution. The Standard Oil Company (New Jersey) down to the year 1906 carried a profit and loss account with each stock investment in a subsidiary company, which represented the New Jersey company's proportion of the surplus or undivided profits of the subsidiary company not paid to the New Jersey corporation dividends.

On November 20, 1902, the balance standing to account of surplus on the books of the Standard Oil Company (New Jersey) was transferred to " reserve profits account " and since November 20, 1902, all earnings in excess of the amount required to pay dividends have been transferred to reserve profits. The cash earnings of the Standard Oil Company (New Jersey) between January 1, 1899, and December 1, 1911, from its own business and cash dividends from all subsidiaries (not including cash earnings accumulated but not distributed by subsidiaries) exceeded the dividends paid by the Standard Oil

Company (New Jersey) during said period by $328,691,788.13, which is over $48,000,000 more that the amount at which the stock distributed on December 1, 1911, was then carried on the books of the Standard Oil Company (New Jersey).

The book value per share of the stock of the Standard Oil Company (New Jersey) on December 31, 1899, was $202.32.

Before the distribution of December 1, 1911, accumulated earnings had brought this book value up to $566.57.

After this distribution the book value was $281.72 per share.

On February 15, 1913, the Standard Oil Company (New Jersey), pursuant to resolution of its board adopted on February third, paid a cash dividend of forty per cent to stockholders of record at the close of business on February 7, 1913. The preamble to the resolution referred to this distribution as arising from the collection of large sums of money which had been owing by the former subsidiaries of the Standard Oil Company (New Jersey) at the time of the distribution in 1911 and which had since been collected into the treasury of the Standard Oil Company (New Jersey).

The book value of the stock of the Standard Oil Company (New Jersey) before this forty per cent distribution was $289.89 and after such distribution was $249.89.

This distribution, like the distribution of stocks in 1911, was charged to reserve profits.

The journal vouchers in reference to this dividend were as follows:

" JOURNAL VOUCHER 79. .

"NEW YORK, *February* 15*th*, 1913.

" Received
" from        Standard Oil Company,
(New Jersey)

" Check to order of National City Bank for credit to Standard Oil Co. (N. J.) Dividend Account..... ............... $39,335,320 00.

" For amount of Dividend Checks No. 1 to No. 6090, inclusive, on National City Bank this day to cover distribution of $40.00 per share on 983,383 shares

Common Stock of this Company as per resolution of
Directors Feby. 3d, 1913.
    " For account of Dividends Paid
        " (General Ledger)
            " (Signed)·          C. G. FAY,
                                    " *Asst. Comptroller.*

                " JOURNAL VOUCHER.
                    " Under date of Dec. 31, 1913.
                    "NEW YORK, *Feby.* 19*th*, 1914.
" No. 1019
    " Charge
        " Reserved Profits. . . . . . . . . . . . . .    $39,335,320 00
    " Credit
        " Dividends paid ·
            "For distribution February 15th
                1913, transferred. . . . . . . . . .    $39,335,320 00
                    " Approved
" Entered                  (Signed)          C. G. FAY,
" Jour. Folio 205.                            *Comptroller.*"

At the time of this distribution the Standard Oil Company
(New Jersey) had issued and outstanding 983,383 shares of
common stock and no preferred stock, and its net assets just
prior thereto were $285,074,538.54.

The amount received by the plaintiff as trustee upon the
cash distribution by the Standard Oil Company (New Jersey)
has been paid over to the life beneficiaries as income during
the pendency of this action without objection on the part of
the trustees or the remaindermen.

Between the date of the distribution of December 1, 1911,
and the entry of the judgment in this action, stock dividends
and extraordinary cash dividends were declared and paid
and rights to subscribe for increases of capital stock at par
were offered to stockholders by a number of the former
subsidiaries of the Standard Oil Company (New Jersey)
whose stocks had been distributed in December, 1911, as
follows:

The following companies declared and paid stock dividends:

Anglo-American Oil Company, November 26, 1913, 100 per
cent stock dividend.

Galena Signal Oil Company, May 15, 1913, 50 per cent stock dividend.

Solar Refining Company, June 30, 1913, 300 per cent stock dividend.

South Penn Oil Company, July 31, 1913, 300 per cent stock dividend.

Standard Oil Company (Indiana), May 15, 1912, 2,900 per cent stock dividend.

Standard Oil Company (Kansas), June 30, 1913, 100 per cent stock dividend.

Standard Oil Company (Nebraska), April 25, 1912, 33⅓ per cent stock dividend.

Standard Oil Company (Nebraska), June 30, 1913, 25 per cent stock dividend.

Standard Oil Company (New York), June 30, 1913, 400 per cent stock dividend.

Standard Oil Company (California), May 1, 1916, 50 per cent stock dividend.

A stock dividend amounting to 100 per cent was declared by the Standard Oil Company (Ohio) on May 26, 1916, but had not been paid on the date of the plaintiff's last supplemental account in this action. The judgment as entered directs the disposition to be made of this stock dividend when received.

The following companies offered to stockholders rights to subscribe for additional stock at par:

South Penn Oil Company, July 31, 1913, 100 per cent at par.

Standard Oil Company (California), August 31, 1913, 80 per cent at par.

Standard Oil Company (California), February 2, 1914, 45,183 shares at par.

Standard Oil Company (Kentucky), February 14, 1914, 200 per cent at par.

The Kentucky company at the same time declared a cash dividend of 200 per cent, which was expressly made applicable to payment of the subscription rights.

Swan & Finch Company, August 21, 1912, 400 per cent at par.

Vacuum Oil Company, February 29, 1912, 500 per cent at par.

The following company declared a cash dividend:

Solar Refining Company, December 20, 1913, thirty dollars a share.

Two companies distributed stock of other corporations:

Ohio Oil Company, February 1, 1915, distributed stock of Illinois Pipe Line Company.

Prairie Oil and Gas Company, March 22, 1915, distributed stock of Prairie Pipe Line Company.

The plaintiff, as trustee of the three trusts under the will of Charles F. G. Heye, deceased, received in each case the stock or extraordinary cash dividend so declared and paid in respect to the shares of the stock of the corporation declaring the same theretofore received by the plaintiff upon the distribution of December, 1911. It exercised the right offered to it to subscribe for 200 per cent of the stock held by it in the Standard Oil Company (Kentucky) using for that purpose the cash dividend which by resolution of the company was made expressly applicable to the payment of such stock. In the case of the remaining subscription rights the trustee either sold them for cash or exercised them, paying in the latter event for the additional stock out of the principal of the trust, and in the case of the South Penn Oil Company exercised in part and sold in part the subscription rights offered by resolution of July 31, 1913, by said company.

By the judgment appealed from it is determined that the shares distributed by the Standard Oil Company (New Jersey) in December, 1911, did not constitute a distribution of undivided profits, or of surplus assets in any form, as dividends from earnings of capital, and are not income, rents, issues and profits of the trust estates payable to the life beneficiaries under the will of Charles F. G. Heye, deceased, but that the same accrued to and constitute part of the principal of the trust estates.

It was further adjudged that the stock dividends, cash dividends (other than ordinary dividends) and stock subscription rights declared and offered subsequently to December 1, 1911, by the former subsidiary companies of the Standard Oil Company (New Jersey) were when received by the plaintiff or (in respect to subscription rights) exercised by the plaintiff subject to apportionment between capital and income

of the respective trusts, according to certain rules therein laid down, as follows:

" (a) Where shares of the company declaring the dividend or offering the rights were received by the trustee at the time of the establishment of the trusts and were exchanged for the stock of the Standard Oil Company (New Jersey); or where the stock of such company was then held by the Standard Oil Company (New Jersey), or one of its subsidiary companies, the book value to be maintained in the capital of the trust funds should be computed as of May 10, 1899, the date of the establishment of the trusts.

" (b) Where shares of the company declaring the dividend or offering the rights were not held in the trusts at the time they were established and the stock of such company was not then held but was subsequently acquired by the Standard Oil Company (New Jersey), or one of its subsidiary companies, the book value to be maintained in the capital of the trust funds should be computed as of the date of such acquisition.

" (c) In any case in which the capitalization of any of the subsidiary companies was increased between the date of the establishment of the trusts, or the first acquisition of the stock by the Standard Oil Company (New Jersey), or one of its subsidiary companies, and the date of the distribution in December, 1911, such stock increases should be deemed, for the purposes of the apportionment herein directed, to have become in due proportion a part of the several trust funds as, and when, the stock increases were so respectively acquired by the Standard Oil Company (New Jersey) or one of its subsidiary companies; and the book values of the several portions of such stocks so added to the capitalization of such company should be computed as of the respective dates of such acquisition of the stock and an average book value ascertained as that to be maintained in the capital of the trust funds; and subscription rights, if exercised, or the proceeds, if sold, should be apportioned on the same basis."

These rules are then, by the judgment, applied to the particular facts as found.

As appellants the life beneficiaries appeal from the judgment in so far as it adjudges that the shares received by the trustee

upon the distribution of 1911 constitute part of the principal of the respective trusts, and in so far as it adjudges that any of the subsequent dividends or subscription rights (or proceeds thereof) constitute principal. Their contention is that the distribution of 1911 charged on the company's books to reserve profits is in fact such a distribution of profits; that this distribution is an extraordinary distribution within the meaning of the rules of apportionment laid down in *Matter of Osborne* (209 N. Y. 450, 477), and that under the rules there laid down the life beneficiaries are entitled to the whole of such distribution since in the case at bar the surplus of the company has during the trust period increased through earnings (not including any unearned increment, increased value of real estate, unrealized market or paper profits, etc.) to such an extent that the distribution when made may be awarded to the life beneficiaries without impairing the book value of the trust investment as of the date of the commencement of the trust.

If the shares received by the trustee upon the distribution of 1911 are thus adjudged to the life beneficiaries from the date of their receipt by the trustee the life beneficiaries are, of course, also entitled to all subsequent dividends, distributions and subscription rights accruing upon such shares.

The life beneficiaries, however, claim further that they are entitled to the whole of such subsequent dividends, distributions and subscription rights irrespective of the ultimate decision in reference to their rights to the shares received by the trustee upon the 1911 distribution of the Standard Oil Company (New Jersey).

As respondents upon the appeals taken by the trustee and the remaindermen, the contention of the life beneficiaries is, that the judgment as entered, although giving them less than their rights, is correct so far as it goes, and that the proportion of the extraordinary dividends and subscription rights awarded thereby to the life beneficiaries is, from any point of view, the minimum of their rights.

As appellants, the trustee and the remaindermen contend that the rights to subscribe pertaining to stocks constituting part of the principal of the trusts were principal and are not subject to apportionment between the life beneficiaries

and the principal of the trust funds, nor are rights to sub-scribe, coupled with a cash dividend, equivalent to a stock dividend and subject to a like apportionment. They further contend that the stocks distributed by the Standard Oil Company were acquired by the trust estates at the time of the distribution and must be kept good as of that time as though they had been purchased with funds constituting part of the principal of the estate. The referee held that the interest of the trust estates in the distributed stocks ante-dated their distribution and that the value to be kept good in the case of each stock is the value of the trust estate's *pro ra a* equitable interest therein at the time the trust was established (if it was the stock of one of the twenty companies or was then held by one of the twenty companies), or at the time it was acquired by the Standard Oil Company (New Jersey) (if it was so acquired after the establishment of the trust). In those cases where the holdings of the Standard Oil Company of stock in a company were increased from time to time prior to distribution, the referee held that the trust estate's *pro rata* equitable interest in each lot acquired was to be kept good as of the time of its acquisition. The trustee further contends that in the case of stock dividends not required to keep good the principal of the trust, the life bene-ficiaries are not entitled to the stock itself, but only to the book value of the stock, and that the trustee on paying over such book value to the beneficiary, may retain the stock as principal.

As respondents, the trustee and remaindermen contend that the learned referee was correct in his holding as to the effect of the distribution of 1911, but that even if his position on that point is not sustained, the stock that the trustee turned over to the Standard Oil Company (New Jersey) in 1899 in exchange for the stock of the latter corporation, and which they received back from the Standard Oil Com-pany (New Jersey), must be regarded as principal of the trust.

Taking up for consideration, in the first place, the appeal of the life beneficiaries, I am of opinion that the learned referee was in error in holding that the distribution of 1911 " was not a distribution of undivided profits, or of surplus

assets in any form, as dividends from earnings from capital," and the shares distributed thereunder " were not, when received by the plaintiff, income, rents, issues or profits of the trust estates, payable to the life beneficiaries under the will of Charles F. G. Heye, but accrued to the principal of the trust estates." I believe that this question is determined by the decision of the Court of Appeals in *Matter of Brann* (219 N. Y. 263). That case involved the construction of the will and codicil of Alice V. Leavitt. The will was made in 1908. After a specific legacy, it created a trust for the annual payment of $600 to a brother for life, with remainder to charities. The subject of the trust was described by the testatrix as " the 30 shares of stock of the Standard Oil Co. owned by me." These shares then constituted the bulk of her estate. All the rest, residue and remainder of the estate, " including any legacy which may lapse or be void," she gave to her friend, Mrs. Johnston. The brother died in April, 1911, prior to the distribution in question by the Standard Oil Company (New Jersey) of the stocks of the subsidiary company. Nine months after such distribution (in September, 1912) the testatrix made a codicil. Her brother was then dead; the shares of the subsidiary companies were already in her hands; and by her codicil she gave money legacies amounting to $1,700 to friends and charities, and disposed of a picture. " In all other respects," she provided, " I do hereby ratify and confirm my said will." Three months later she died. The question presented for determination was whether the shares in the thirty-nine subsidiary companies passed as part of the original shares, or stood separate and by themselves and passed to the residuary legatee. In the discussion of the question the status of the shares distributed was discussed at length by the court, and became relevant to the decision. It was a question presented by the briefs of the respective counsel upon the appeal and had been discussed in both the prevailing and the dissenting opinion in this court (171 App. Div. 800). Judge Cardozo, in his opinion, first disposed of the argument (again advanced on this appeal) that the distribution of the stocks in the subsidiary companies by the Standard Oil Company (New Jersey) was compulsory. He said: " In December of the same year

[1911], the Standard Oil Company of New Jersey distributed among its stockholders the shares which it held in a large number of subsidiary oil companies. It did this under the compulsion of a decree of the United States Supreme Court by which it was required to dispose of its holdings in corporations under its control. The decree did not compel it to distribute the holdings among its own stockholders. It might have sold the shares and distributed the money, or even kept the money in its treasury. It elected, however, to distribute the shares in kind." (*Matter of Brann,* 219 N. Y. 263, 266.) The court then proceeded to consider the main question involved and in so doing held that there was no substantial identity between this extraordinary dividend distributed by the Standard Oil Company (New Jersey), consisting of the stocks in the subsidiary companies, and the shares upon which the dividend was paid, thus answering a contention again advanced upon this appeal, that the distributed stocks, together with the stock of the New Jersey company (representing the undistributed assets), merely represented the shares of the New Jersey company as they were prior to the distribution, and that as the New Jersey stock formed part of the capital of the trust in question, the stocks substituted for it as the result of the distribution likewise form part of the capital of the stock. Judge CARDOZO proceeded to say: " It is true that the gift of the thirty shares is a specific legacy, and that a specific legacy will be construed in the light of the situation existing when it was made (*Matter of Delaney,* 133 App. Div. 409; 196 N. Y. 530). But it is also true that unless the subject of a specific legacy exists, unchanged in substance, at the date of the will, there results an ademption, complete or partial according to the facts. In strictness, there has been in this case no ademption at all, for the thirty shares, which were the subject of the legacy, exist; but since the subsidiary shares, while held by the parent company, helped to give the primary shares their value, the analogy of ademption becomes useful. *Slater* v. *Slater* (L. R. [1 Ch. 1907] 665) states the controlling principle, and applies it to a situation similar to the one at hand. The principle is that a change in the nature of the property works an ademption unless it is a change ' in name or form only '

First Department, February, 1918.          [Vol. 181.

(*Slater* v. *Slater, supra,* at pp. 671, 672, quoting *Oakes* v. *Oakes,* 9 Hare, 666, 672. See, also, *Norris* v. *Harrison,* 2 Maddocks, 268). It may be that where the change is merely formal, as where a company is reorganized and there is a reissue of the shares, the identity of the gift will be held to be substantially preserved (*Mallam* v. *McFie,* L. R. [1 Ch. 1912] 29; *Turner* v. *Leeming,* L. R. [1 Ch. 1912] 828), but that is not this case. Here the original shares remain intact, and there is no contest about them. The new shares are, in effect, an extraordinary dividend declared during the life of the testatrix (*Brundage* v. *Brundage,* 60 N. Y. 544; *Equitable Life Assurance Society* v. *Union Pacific R. R. Co.,* 212 N. Y. 360). The case stands the same as if the Standard Oil Company had sold the shares, and distributed the proceeds. It is hardly denied that a voluntary dividend, whether paid in money or in stock, would be separate from the primary shares. The argument is that a different rule is applicable here because the dividend was compulsory. But the suggested distinction is inadequate. It was once thought that ademption was dependent on intention, and ' it was, therefore, held in old days that when a change was effected by public authority, or without the will of the testator, ademption did not follow. But for many years, that has ceased to be law ' (*Slater* v. *Slater, supra,* at p. 671). It has ceased to be law in England (Jarman, p. 163;* *Slater* v. *Slater, supra*). It has ceased to be law in New York (*Ametrano* v. *Downs,* 170 N. Y. 388). What courts look to now is the fact of change. That ascertained, they do not trouble themselves about the reason for the change. We cannot find substantial identity between this extraordinary dividend and the shares from which they came." (*Matter of Brann,* 219 N. Y. 263, at pp. 267, 268.)

The force of this opinion is sought to be avoided by counsel for the remaindermen by treating as *dictum* so much thereof as characterizes the distribution of 1911 as an extraordinary · dividend. But not merely is the reasoning of the court persuasive but the reiteration of the description of the distribution as an " extraordinary dividend " and the cases cited to support that description (*Brundage* v. *Brundage,* 60 N. Y.

---

* 6th Eng. ed.— [REP.

544, and *Equitable Life Assurance Society* v. *Union Pacific R. R. Co.*, 212 id. 360) together with the importance attached by the court to the determination of the nature of the distribution in question (because of its direct effect upon the nature of the stock whose ownership was before the court for adjudication), all demonstrate that the conclusion reached as to the character of this distribution was an essential part of its opinion and to be respected and followed as such. The case of *Equitable Life Assurance Society* v. *Union Pacific R. R. Co.* (212 N. Y. 360) is particularly illuminating as to the view which the court, in the *Brann* case, took of the distributed stocks as representing a distribution of surplus profits. In the *Equitable* case the facts are set forth in the opinion of Mr. Justice CLARKE in this court (162 App. Div. 81) as follows:

" In 1901 and 1902 the defendant purchased $90,000,000 of common stock of the Southern Pacific Company and $78,000,000 of stock of the Northern Pacific Railway Company and thereafter transferred said stock to the Oregon Short Line Railroad Company, a corporation subsidiary to and entirely controlled by defendant. Said stocks were paid for with the proceeds of the sale of the following bonds: $100,000,000 face value first lien four per cent convertible gold bonds, which bonds were thereafter to the extent of $99,450,000 converted by the holders into a like amount of the common stock of the defendant; $31,000,000 face value four per cent participating twenty-five year gold bonds of said Oregon Short Line Railroad Company, which bonds were thereafter redeemed from proceeds of sale of about $32,625,000 face value of four per cent twenty-five year refunding bonds of said Oregon Short Line Railroad Company.

" In 1902 the Northern Pacific Railway Company stock aforesaid was exchanged for upwards of $82,000,000 par value of stock of the Northern Securities Company. In 1905, upon the dissolution of the Northern Securities Company, said Oregon Short Line Railroad Company sold a part of its holdings of stock of said Northern Securities Company and received in exchange for the balance of said holdings a large amount of the stocks of the Northern Pacific Railway Company and Great Northern Railway Company theretofore

held in the treasury of the said Northern Securities Company. Thereafter said Oregon Short Line Railroad Company sold the entire amount of stocks of the Northern Pacific Railway Company and the Great Northern Railway Company so acquired by it and reinvested the proceeds in stock of various other companies including $32,334,200 par value of common and $7,206,400 of preferred stock of the Baltimore and Ohio Railroad Company. In 1913, pursuant to a decree entered in a suit brought by the United States against the defendant and said Oregon Short Line Railroad Company requiring said companies to dispose of the Southern Pacific Company's stock then held by them, said Oregon Short Line Railroad Company exchanged with the Pennsylvania Railroad Company $38,292,400 of the Southern Pacific Company stock held by it for $21,273,600 of common, and $21,273,600 of preferred stock of the Baltimore and Ohio Railroad Company. The capital stock of the Baltimore and Ohio Railroad Company acquired as aforesaid to the amount of $28,480,000 of preferred and $53,607,800 common stock was thereafter acquired by defendant from the Oregon Short Line Railroad Company.

" The proceeds of the sales, as alleged, of stocks of the Northern Securities Company, Northern Pacific Railway Company and Great Northern Railway Company exceeded by the amount of $58,684,157 the cost of the stock of the Northern Pacific Railway Company from which said securities were derived, and after the sale this amount was credited by the Oregon Short Line Railroad Company to its profit and loss account and paid by it as a special dividend to the defendant as the holder of all its capital stock, and said amount was credited by defendant to its profit and loss account, and is included in its surplus as claimed. Various items of excess over cost realized by defendant on the sale of the other stocks and securities have likewise been credited to its profit and loss account and included in its claimed surplus.

" In July, 1907, defendant issued and sold bonds known as its twenty-year four per cent convertible gold bonds realizing upon said sale ninety per cent of the face value thereof in cash and charging to said profit and loss account the discount of ten per cent. Said bonds, by their terms, are convertible at the option of the holders into common capital

stock of the defendant at the rate of $175 face value of such bonds for $100 par value of such stock. Prior to January 8, 1914, of the bonds so issued there were surrendered for conversion $37,025,800 face value, and in exchange therefor and upon the retirement of said bonds there was issued to the holders common capital stock of the defendant to the amount of $21,157,600 par value. The net reduction of defendant's liabilities resulting from said bond conversion, to wit, the sum of $15,868,200, has been credited by defendant to said profit and loss account and is included in the surplus claimed by it.

" The defendant by its charter and the laws of Utah is authorized to issue preferred and common stock, and now has outstanding 995,435 shares of the par value of $99,543,500 of preferred and 2,166,624 shares of the par value of $216,-662,400 of common stock. The articles of association of said corporation provide as follows with regard to the respective priorities of said two classes of stock: ' Such preferred stock shall be entitled, in preference and priority over the common stock of said corporation, to dividends in each and every fiscal year, at such rate, not exceeding four per cent per annum, payable out of net profits, as shall be declared by the Board of Directors. Such dividends are to be non-cumulative, and the preferred stock is entitled to no other or further share of the profits.'

" And it is alleged that ' in all other respects said preferred and said common stock are entitled under said Articles of Association and the laws of Utah to equal rights in said corporation and its assets.'

" On January 8, 1914, the directors of defendant declared an extra dividend upon its common capital stock, payable April 1, 1914, consisting of the following amounts upon each share:

" *First.* Three dollars in cash.

" *Second.* Twelve dollars par value of preferred capital stock of the Baltimore and Ohio Railroad Company, and

" *Third.* Twenty-two dollars and fifty cents par value of common capital stock of the Baltimore and Ohio Railroad Company.

" The value of the stocks and cash proposed to be distributed by way of such extra dividend is approximately $80,000,000.

First Department, February, 1918.    [Vol. 181.

" The dividend of four per cent per annum has been regularly declared and paid upon the preferred stock. Defendant's board of directors resolved that the extra dividend declared as aforesaid on January 8, 1914, was declared out of accumulated surplus of defendant, and that the capital stock of the Baltimore and Ohio Railroad Company which should be disposed of pursuant to said dividend declaration be charged to defendant's profit and loss account, and expressly found and declared that the accumulated unappropriated surplus profits of defendant exceeded the amount necessary to pay such dividend. While the complaint expressly alleges ' that the aggregate value of the assets of the defendant exceeds the aggregate amount of its outstanding capital stock and liabilities by the amount of the surplus or credit balance to its said profit and loss account,' it is claimed that the stock of the Baltimore and Ohio Railroad Company and the funds from which the proposed dividend is to be paid constitutes a capital asset of the defendant and forms a part of the *corpus* of its property, and that plaintiff and the other holders of preferred stock are entitled to share *pro rata* with the holders of common stock in any distribution of capital assets or accretions of capital."

The question before the court was whether the distribution of the Baltimore and Ohio stock was a distribution of profits or a distribution of capital, and it was held to be a distribution (even though unusual in amount) of accumulated gains or profits, which the directors of a going concern may at any time at their discretion divide among stockholders as income on their investment. The Court of Appeals said (p. 366): " When a corporation is organized it secures capital by the issue of shares of capital stock. The fund or property thus secured answers the twofold purpose of furnishing means for carrying on the operations of the corporation and also security for the payment of creditors. This capital stock is carried as a liability and universally, so far as I am aware, at its par amount. It is thus carried as a liability because this is the proper bookkeeping entry. But aside from this, such entry also serves to emphasize the duty of the corporation to keep its capital stock unimpaired for the protection of those dealing with it. If the operations of the corporation

result in gains, such gains are carried to the credit, not of the capital stock account but of some other account as surplus or profit and loss. Of course they may be capitalized by the issue of stock against them and sometimes in the cases of certain corporations like banks or insurance corporations where a certain ratio between assets and liabilities other than to capital stock is required, such surplus or profits may be counted and maintained as capital although not formally capitalized.

" In the absence of some such special consideration I think we may take notice that it is the ordinary rule of corporate management established by decisions, statutes and business usages that the surplus of these gains or profits beyond what may be necessary to keep good the liability to capital stock which has been issued, may, in the discretion of a board of directors, be distributed amongst its stockholders as dividends and returns on their investment."

Judge HISCOCK also quoted with approval (at p. 372) from the opinion in *Williams* v. *Western Union Telegraph Co.* (93 N. Y. 162) wherein it was said (at p. 191): " But if it can be conceived that this was a dividend of property within the meaning of the section of the Revised Statutes above set out, then what property did it divide? Not any portion of the capital of the company; that remained intact. After subtracting the dividend there remained to the company the full amount of its prior capital stock, to wit: Property to the value of $41,073,410. . Such is the finding of the trial court, and that cannot here be disputed. The company had made surplus earnings which it could have divided, but instead of dividing them it had invested them in property to facilitate and enlarge its business; and such property was found to be worth $15,526,590. That sum constituted its surplus. It was commingled with the other property of the company and used for corporate purposes. But it was not beyond the reach of the dividend-making power of the directors. They could reclaim it for division among the stockholders, and, if practicable, convert it into cash for that purpose. They could borrow money on the faith of it and divide that. They could issue to the stockholders certificates of indebtedness, redeemable in the future, representing their respective interests

in such surplus, thus, in effect, borrowing the same of the stockholders. Desiring to use the surplus and add it to the permanent capital of the company, and having lawfully created shares of stock, they could issue to the stockholders such shares to represent their respective interests in such surplus."

The referee's findings herein, supported by the proof, established that the cash undistributed earnings of the Standard Oil Company (New Jersey) from January 1, 1899 (little over a month before testator's death), to December 1, 1911, were $328,691,788.13, which sum exceeds by over $48,000,000 the value of the stocks distributed. The vouchers of the company and its books treat the distribution as one of " reserve profits " or " accumulated profits." The laws of the State of New Jersey prohibit the making of any dividends, except from surplus or from net profits arising from the business of the corporation unless its capital stock was reduced. (" An Act concerning corporations [Revision of 1896]," N. J. Laws of 1896, chap. 185, § 30, as amd. by N. J. Laws of 1904, chap. 143; 2 Comp. Stat. 1617, § 30.)

Treating the distribution of stocks as an extraordinary dividend, the rule applicable thereto is laid down in *Matter of Osborne* (209 N. Y. 450, 477): " 2. Extraordinary dividends, payable from the accumulated earnings of the company, whether payable in cash or stock, belong to the life beneficiary, unless they entrench in whole or in part upon the capital of the trust fund as received from the testator or maker of the trust or invested in the stock, in which case such extraordinary dividends should be returned to the trust fund or apportioned between the trust fund and the life beneficiary in such a way as to preserve the integrity of the trust fund."

The action of the Standard Oil Company (New Jersey) was the setting apart for distribution among the stockholders by valid resolution of its directors of a portion of the corporate assets made available through accumulated earnings and without impairing the capital stock of the corporation. It makes no difference with the rule to be applied whether the distribution is practically enforced or voluntarily made. (*Hazzard* v. *Philips*, 173 App. Div. 431.) In the present case the particular course followed in the distribution can hardly be called compulsory, as other courses were left open

by the decision of the United States Supreme Court, even if they were less practicable. Nor was it necessary that the resolution of distribution should be called in terms a dividend. " A division of profits without the formality of declaring a dividend is the equivalent of declaring a dividend." (*Hartley* v. *Pioneer Iron Works,* 181 N. Y. 73.)

In the case at bar the original shares of the Standard Oil Company (New Jersey) stock owned by the testator and passing to his trustees were not reduced either in number or value by the distribution, nor was the capital of the trust fund as received from the testator entrenched upon, either in whole or in part. On the contrary, after this distribution of stocks the book value of the shares in the Standard Oil Company (New Jersey) was $281.72 per share, while on December 31, 1899, the book value of each share was only $202.32. I am, therefore, of opinion that the integrity of the trust fund having been in no way impaired by the distribution in question, the shares of stock so distributed by way of extraordinary dividend must be awarded to the life beneficiaries.

As the stocks distributed were the property of the life beneficiaries from the date of their receipt by the trustee, the life beneficiaries are, of course, also entitled to all subsequent dividends, distributions and subscription rights accruing upon shares, and no questions of apportionment arise in reference thereto.

I believe that the judgment appealed from should be modified so as to award to the life beneficiaries all shares received by the trustee upon the distribution by the Standard Oil Company (New Jersey) in December, 1911, and January, 1912, as well as all extraordinary dividends and subscription rights made or offered thereafter by any of the companies whose stocks were so distributed; and as so modified, the judgment should be affirmed, with costs to all parties who have appeared on this appeal, payable out of the trust fund.

Judgment modified as stated in opinion, and as modified affirmed, with costs to all parties appearing, payable out of the trust fund.